# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

—————————————————————————

|  |  |  |
|---|---|---|
| WEBB WHEEL PRODUCTS, INC., | : | |
| *Plaintiff,* | : | |
| and | : | |
| CONSOLIDATED METCO, INC., and SHANDONG CONMET MECHANICAL CO., LTD., | : | |
| *Consolidated Plaintiffs,* | : | |
| v. | : | Consol. Court No. 25-00207 |
| UNITED STATES, | : | |
| *Defendant,* | : | **<u>Non-Confidential Document</u>** |
| CONSOLIDATED METCO, INC., and SHANDONG CONMET MECHANICAL CO., LTD., | : | |
| *Defendant-Intervenors,* | : | |
| and | : | |
| WEBB WHEEL PRODUCTS, INC., | : | |
| *Consolidated Defendant-Intervenor.* | : | |

—————————————————————————

## <u>CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Consolidated Plaintiffs Consolidated Metco, Inc. and Shandong ConMet Mechanical Co., Ltd. hereby move for judgment on the agency record with regard to the U.S. Department of Commerce's ("Commerce") final affirmative determination in *Certain Brake Drums From People's Republic of China: Final*

*Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025). For the reasons explained in the accompanying memorandum, Consolidated Plaintiffs respectfully move the Court to hold that Commerce's determination is neither supported by substantial evidence nor in accordance with law.  Consolidated Plaintiffs further move the Court to remand this matter to Commerce for disposition consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
Julia K. Eppard
Paul S. Bettencourt
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4046
E-mail: mnicely@akingump.com

Dated: March 23, 2026                    *Counsel for ConMet and Shandong ConMet*

2

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

|  |  |  |
|---|---|---|
| WEBB WHEEL PRODUCTS, INC., | : | |
| *Plaintiff,* | : | |
| and | : | |
| CONSOLIDATED METCO, INC., and SHANDONG CONMET MECHANICAL CO., LTD., | : | |
| *Consolidated Plaintiffs,* | : | |
| v. | : | Consol. Court No. 25-00207 |
| UNITED STATES, | : | |
| *Defendant,* | : | |
| CONSOLIDATED METCO, INC., and SHANDONG CONMET MECHANICAL CO., LTD., | : | |
| *Defendant-Intervenors,* | : | |
| and | : | |
| WEBB WHEEL PRODUCTS, INC., | : | |
| *Consolidated Defendant-Intervenor.* | : | |

## **PROPOSED ORDER**

Upon consideration of Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the

Agency Record, as well as all other papers filed in Court No. 25-00207, it is hereby

**ORDERED** that Consolidated Plaintiffs' Motion is **GRANTED**;

**ORDERED** that the U.S. Department of Commerce's ("Commerce") Final Determination

in *Certain Brake Drums From People's Republic of China: Final Affirmative Determination of*

*Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025) is neither supported by substantial evidence on the record nor in accordance with law; and

**ORDERED** that Commerce shall issue a revised determination on remand that is supported by substantial evidence, in accordance with law, and otherwise consistent with all aspects of the Court's order and opinion in this matter.

Dated: _____                                    _____
      New York, NY                                                Timothy C. Stanceu, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

|  |  |
|---|---|
| WEBB WHEEL PRODUCTS, INC., | : |
| *Plaintiff,* | : |
| and | : |
| CONSOLIDATED METCO, INC., and SHANDONG CONMET MECHANICAL CO., LTD., | : |
| *Consolidated Plaintiffs,* | : |
| v. | : |
| UNITED STATES, | : |
| *Defendant,* | : |
| CONSOLIDATED METCO, INC., and SHANDONG CONMET MECHANICAL CO., LTD., | : |
| *Defendant-Intervenors,* | : |
| and | : |
| WEBB WHEEL PRODUCTS, INC., | : |
| *Consolidated Defendant-Intervenor.* | : |

Consol. Court No. 25-00207

**Non-Confidential Document**

**CONSOLIDATED PLAINTIFFS' MEMORANDUM IN
SUPPORT OF ITS RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

**TABLE OF CONTENTS**

I. Introduction.................................................................................................................1

II. Statement Pursuant to Rule 56.2(c)(1).....................................................................1

    A. Administrative Determination Under Review ....................................................1

    B. Issues of Law and Bases for Remanding Commerce's Determination...................2

III. Statement of the Case...............................................................................................2

    A. Statutory Framework ........................................................................................2

        1. Legal Considerations for Commerce's Final Determination .....................2

    B. Factual Background .........................................................................................3

        1. Commerce's Antidumping Investigation ....................................................3

        2. Commerce's Preliminary Determination ....................................................5

        3. Commerce's Final Determination ..............................................................6

IV. Subject Matter Jurisdiction and Standard of Review...............................................7

    A. The Court Has Subject Matter Jurisdiction.......................................................7

    B. Commerce Must Support Its Determinations with Substantial Evidence................7

    C. Commerce Determinations Must Be in Accordance with Law ............................8

        1. Commerce Must Act Consistently with the Statute ...................................8

        2. Commerce Cannot Act Arbitrarily and Capriciously.................................8

V. Summary of Argument...............................................................................................9

VI. Commerce's Final Determination Is Not Supported by Substantial Evidence or Otherwise Not in Accordance with Law ........................................................................10

    A. Commerce's Decision to Value Shandong ConMet's Inland Freight Expenses Using Data from the World Bank's *Doing Business – Turkey* Report Was Unsupported by Substantial Evidence and Not in Accordance with Law ........................................................................................................10

        1. *Substantial evidence and law do not support Commerce's decision because it is inconsistent with Commerce's own selection criteria.* ..........11

        2. *Substantial evidence and law do not support Commerce's decision because it unlawfully results in an aberrational surrogate value.*.............21

    B. Commerce's Calculation of Shandong ConMet's Surrogate Value for Inland Freight Expenses Was Unsupported by Substantial Evidence and Not in Accordance with Law ........................................................................25

        1. *Commerce's calculation was unsupported by substantial evidence because it erroneously inflated the surrogate value.* ...............................26

        2. *Commerce's calculation is inconsistent with its legal obligation to accurately value Shandong ConMet's factors of production and movement expenses.* ................................................................................30

    C. Commerce's Calculation of Shandong ConMet's Surrogate Value for Brokerage and Handling Expenses Was Unsupported by Substantial Evidence and Not in Accordance with Law............................................................31

    D. Commerce's Reclassification of Shandong ConMet's Scrap Cast Iron Fields as Byproducts Was Unsupported by Substantial Evidence and Not in Accordance with Law ............................................................................32

1.    *Substantial evidence does not support Commerce's reclassification of scrap cast iron.*......................................................................................33

2.    *Commerce's reclassification is not in accordance with law.*......................38

VII.    Conclusion ..............................................................................................................38

ii

# TABLE OF AUTHORITIES

**CASES**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327 (Ct. Int'l Trade 2011) .................................................................................................................... 7, 12, 20

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ........................................................................ 8

*Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) .............. 23

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...................................................................... 7

*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016)........................ 7, 21, 24, 28

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185 (Ct. Int'l Trade 2004) .................................................................................................................................... 23

*Jacobi Carbons AB v. United States*, 619 F. Appx 992 (Fed. Cir. 2015) ..................................... 23

*Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347 (Ct. Int'l Trade 2007)..................... 8, 24

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).............................................................. 8

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017)....................... 8, 25, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .......................... ......................................................................................................... 9, 20-21, 25, 31-32

*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019)......................................................................... 8

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .......................... 7, 30, 32, 37

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ...................................... 9, 13, 19

*OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375 (Fed. Cir. 2019)......................................... 8, 24

*Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010).......................... 9

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)............................................... 9, 38

*SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020)................................... 17

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ........................................... 9

*Tri Union Frozen Prods., Inc. v. United States*, 254 F. Supp. 3d 1290 (Ct. Int'l Trade 2017).......... .................................................................................................................................... 22

*Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290 (Ct. Int'l Trade 2007) ................................................................................................................. 9, 23, 37

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)......................................................... 7, 22

*Vinh Hoan Corp. v. United States*, 179 F. Supp. 3d 1208 (Ct. Int'l Trade 2016).......................... 18

## STATUTES

19 U.S.C. § 1516a(a)(2)(b)(i) ..................................................................................................... 7

19 U.S.C. § 1516a(b)(1)(b)(i) ................................................................................................ 7, 8

19 U.S.C. § 1677(18) ................................................................................................................. 2

19 U.S.C. § 1677b(c) .............................................................................. 3, 18, 25, 30, 32, 38

28 U.S.C. § 1581(c) .................................................................................................................. 7

## REGULATIONS

19 C.F.R. § 351.408 ................................................................................................................2-3

19 C.F.R. § 351.408(c)............................................................................................ 3, 25, 30, 32

19 C.F.R. § 351.408(c)(2) ....................................................................................................... 17

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) ................................................................................................................................... 22

## ADMINISTRATIVE DECISIONS

*2,4-Dicholorphenoxyacetic Acid From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 14,964 (Apr. 7, 2025) ...... 20, 24

*Aluminum Lithographic Printing Plates From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 79,256 (Sept. 27, 2024) ............................................. 15

*Cast Iron Soil Pipe Fittings From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 Fed. Reg. 33,205 (July 17, 2018)...........................................33-38

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 67,671 (Nov. 9, 2022)............................................................................. 11-13, 15, 20, 24

*Certain Brake Drums From People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025) ........................... 1, 2, 6, 7

*Certain Brake Drums from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 8383 (Jan. 29, 2025) ................................... 5

*Certain Brake Drums From the People's Republic of China and the Republic of Türkiye: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 58,116 (July 17, 2024) .......... 4

*Small Diameter Graphite Electrodes From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) ..... ................................................................................................................................. 34, 36-38

*Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 Fed. Reg. 9861 (Feb. 15, 2023)........................................................................................ 11-15, 20, 24

**OTHER**

*Harmonized Tariff Schedule of the United States Revision 4 (2026)*, USITC Pub. 5711 (Feb. 2026)……………………………………………………………………………………..16

Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004) …………………………………………………………….3, 11, 14, 17-18

## I.    Introduction

This brief is submitted on behalf of Consolidated Plaintiffs Consolidated Metco, Inc. and Shandong ConMet Mechanical Co., Ltd. in support of their Rule 56.2 Motion for Judgment on the Agency Record challenging the Final Determination issued by the United States Department of Commerce ("Commerce") in the antidumping duty investigation of certain brake drums from the People's Republic of China ("China").

For the reasons set forth in this brief, Commerce made several errors in calculating Shandong ConMet's dumping margin.  First, contrary to record evidence and its own selection criteria, Commerce used a freight rate in the World Bank's *Doing Business – Turkey* report as the surrogate value for Shandong ConMet's inland freight expenses.  Second, in calculating the surrogate value for inland freight, Commerce unlawfully applied an adjustment to U.S. dollar ("USD")-denominated values based on inflation of the Turkish lira ("lira"), which resulted in an erroneous calculation of the surrogate value.  Third, in calculating the surrogate value for brokerage and handling expenses, Commerce unlawfully applied the same erroneous inflation adjustment to USD-denominated values that distorted the calculation of the surrogate value.  Fourth, Commerce unlawfully reclassified Shandong ConMet's scrap cast iron fields as byproducts, contradicting record evidence that Shandong ConMet reintroduces scrap cast iron into its production process.  The Court should hold that Commerce's Final Determination lacks legal and factual support and remand to Commerce.

## II.    Statement Pursuant to Rule 56.2(c)(1)

### A.    Administrative Determination Under Review

Consolidated Plaintiffs seek judicial review of the Final Determination issued by Commerce in the antidumping duty investigation of certain brake drums from China.  *See Certain*

*Brake Drums From People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025) ("Final Determination").

> **B.    Issues of Law and Bases for Remanding Commerce's Determination**

1.    Whether the law and substantial evidence support Commerce's determination that the data from the World Bank's *Doing Business – Turkey* report were the best available data on the record for purposes of valuing Shandong ConMet's inland freight expenses.

2.    Whether the law and substantial evidence support Commerce's calculation of Shandong ConMet's surrogate value for inland freight expenses by applying an inflator based on inflation of the lira to values denominated in USD.

3.    Whether the law and substantial evidence support Commerce's calculation of Shandong ConMet's surrogate value for brokerage and handling expenses by applying an inflator based on inflation of the lira to values denominated in USD.

4.    Whether the law and substantial evidence support Commerce's reclassification of Shandong ConMet's scrap cast iron fields as byproducts, instead of direct materials.

Because neither substantial evidence nor the law support these decisions made by Commerce, the Court should remand and order Commerce to reconsider them.

## III.    Statement of the Case

> **A.    Statutory Framework**

> ### 1.    Legal Considerations for Commerce's Final Determination

In evaluating whether foreign producers of subject merchandise made sales at less than fair value, Commerce employs a distinct methodology for investigations of foreign producers in non-market economy countries. *See* 19 U.S.C. § 1677(18). Pursuant to its methodology for non-market economies, Commerce calculates normal value by identifying each respondent foreign producer's factors of production and selecting surrogate values to value those factors of production. 19 C.F.R.

§ 351.408.  The statute requires Commerce, to the extent possible, to select surrogate values from one or more market economy countries that are: (i) at a level of economic development comparable to that of the non-market country; and (ii) a significant producer of comparable merchandise.  19 U.S.C. § 1677b(c)(4).

Commerce has further clarified its interpretation of this mandate in Policy Bulletin 04.1, enunciating its adoption of a sequential analysis of the statutory elements in identifying countries from which surrogate values may be sourced: (1) whether the proposed surrogate countries are economically comparable; (2) whether the potential surrogate countries produce comparable merchandise; (3) whether the candidates are significant producers of comparable merchandise; and finally (4) whether reliable data are available from the candidate countries.  Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004) ("Policy Bulletin 04.1").  In choosing among surrogate values, Commerce's preference is to rely on data that are (1) reflective of broad market averages; (2) publicly available; (3) product specific; (4) tax and duty exclusive; and (5) contemporaneous with the period of investigation ("POI").  *See* Memorandum from Scot Fullerton to Abdelali Elouaradia, *Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China* (June 13, 2025) at 12, P.R. 425 ("*Final IDM*").  Commerce retains a legal obligation to select surrogate values that accurately reflect the mandatory respondents' cost of production and movement expenses.  19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(c).

### B.    Factual Background

#### 1.    Commerce's Antidumping Investigation

On June 20, 2024, Webb Wheel Products, Inc. filed a petition to Commerce and the U.S. International Trade Commission, seeking the imposition of antidumping and countervailing duties

3

on U.S. imports of certain brake drums from China and the Republic of Türkiye ("Turkey").  *See Petition for the Imposition of Antidumping and Countervailing Duties on Imports of Certain Brake Drums from the People's Republic of China and Türkiye* (June 20, 2024), C.R. 1-9/P.R. 1-8. Commerce initiated the antidumping duty investigations of brake drums from China and Turkey on July 10, 2024.  *See Certain Brake Drums From the People's Republic of China and the Republic of Türkiye: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 58,116 (July 17, 2024). Commerce's antidumping investigation of brake drums from China covered a POI from October 1, 2023, through March 31, 2024.

On August 26, 2024, Commerce selected Shandong ConMet for individual examination in the antidumping duty investigation regarding China and issued an initial questionnaire to Shandong ConMet.  Memorandum from Samuel Frost through Kabir Archuletta to Scot Fullerton, *Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China: Respondent Selection* (Aug. 26, 2024), C.R. 91/P.R. 149.  From September 2024 through January 2025, Shandong ConMet submitted timely responses to the questionnaire, responses to supplemental questionnaires issued by Commerce, and factual information to value Shandong ConMet's factors of production.  The responses included information and data concerning sales of subject merchandise to the United States through Shandong ConMet's affiliated U.S. importer, ConMet.

When responding to Commerce questionnaires regarding its factors of production, Shandong ConMet reported the quantity of cast iron used in the production process for brake drums.  Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Response to Section D of the Department's Initial Questionnaire* (Oct. 17, 2024), C.R. 205-210, 213-215/P.R. 225-227, 229-231.  Shandong ConMet

explained that some of the cast iron used in the production process was treated as scrap, then subsequently reintroduced into future production runs, thereby reducing the amount of raw material that Shandong ConMet would otherwise need to purchase in order to manufacture subject merchandise.  *Id*. at 17, C.R. 205-210, 213-215/P.R. 225-227, 229-231.  To ensure detailed and accurate reporting, Shandong ConMet reported the amount of cast iron introduced into the production process and reported the scrap cast iron that was removed from and reintroduced to the production process as a negative amount, thereby reflecting the net amount of purchased cast iron that it actually needed to produce subject merchandise.  *Id.* at 17, C.R. 205-210, 213-215/P.R. 225-227, 229-231.

## 2.    Commerce's Preliminary Determination

On January 29, 2025, Commerce published its Preliminary Determination in the Federal Register.  *See Certain Brake Drums from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination and Extension of Provisional Measures*, 90 Fed. Reg. 8383 (Jan. 29, 2025) ("Preliminary Determination").  Commerce preliminarily determined that certain brake drums from China were being, or were likely to be, sold in the United States at less than fair value.  Commerce calculated a weighted-average dumping margin of 109.64 percent for Shandong ConMet.  *Id*. at 8384.  In the Decision Memorandum accompanying the Preliminary Determination, Commerce explained the basis for Shandong ConMet's preliminary dumping margin.  *See* Memorandum from Scot Fullerton to Abdelali Elouaradia, *Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China* (Jan. 23, 2025), P.R. 357 ("Preliminary Decision Memo").  Commerce selected Turkey as the primary surrogate country to value Shandong ConMet's factors of production.  *Id.* at 9, P.R. 357.  To value Shandong ConMet's inland freight, Commerce declined

5

to rely on contemporaneous, public truck freight rates in Turkey published by Turkish transportation provider, Hapag-Lloyd. *Id*. at 24-25, P.R. 357.  Instead, Commerce relied on data from the 2020 version of the World Bank *Doing Business – Turkey* report, which reflected data collected in 2019, to value both inland freight and brokerage and handling expenses. *Id*. at 25, P.R. 357.  Commerce adjusted these USD-denominated figures, which were originally collected in lira then converted to USD for publication in *Doing Business – Turkey*, by applying an inflator based on changes to the value of lira from when the data were collected through the POI. *Id*. at 25, P.R. 357. Regarding Shandong ConMet's scrap iron that was reintroduced into production, Commerce treated the negative values as a reduction in direct material inputs, thereby treating the scrap iron reintroduced as an offset to the cost of manufacturing. *See* Memorandum from Samuel Frost to the File, *Preliminary Analysis Memorandum for Shandong ConMet Mechanical Co., Ltd.* (Jan. 23, 2025) at 5-7, Attach. 1, C.R. 404/P.R. 358.

### 3.    Commerce's Final Determination

On June 18, 2025, Commerce published its Final Determination in the Federal Register. *Certain Brake Drums From People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 26,011 (June 18, 2025).  In the Final Determination, Commerce made several adjustments to its preliminary calculations.  For example, Commerce removed the inflator from the calculation of the electricity surrogate value, recalculated the insurance surrogate value, and revised the aberrationally high surrogate value for Shandong ConMet's recarburizing agent, all of which reduced the dumping margin calculated for Shandong ConMet. *Final IDM* at Comments 3, 5, and 12, P.R. 425.  On the other hand, Commerce also revised its treatment of Shandong ConMet's reintroduced cast iron scrap such that it was an offset to normal value instead of direct materials, which increased the dumping margin calculated for Shandong ConMet from what it otherwise would have been. *Id*. at Comment 15, P.R. 425.

6

Meanwhile, despite ConMet's arguments to the contrary, Commerce did not revise other aspects of the Preliminary Determination, including the use of the World Bank's *Doing Business – Turkey* report to value inland freight and the inflator applied to the World Bank's *Doing Business – Turkey* report values for inland freight and brokerage and handling. *Id*. at Comment 2, P.R. 425. As a result of the Final Determination, the weighted-average dumping margin for Shandong ConMet (and other non-examined companies) declined from 109.64 percent to 77.14 percent. *See* Final Determination.

## IV.     Subject Matter Jurisdiction and Standard of Review

### A.  The Court Has Subject Matter Jurisdiction

Consolidated Plaintiffs bring this action pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) to contest the Final Determination issued by Commerce in the antidumping duty investigation on imports of certain brake drums from China. As a result, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

### B.  Commerce Must Support Its Determinations with Substantial Evidence

With respect to factual findings and conclusions, the Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)). "{S}ubstantial evidence is more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Commerce must "take into account record evidence that fairly detracts from the weight of the evidence supporting its" determinations. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) Moreover, Commerce cannot rely on mere speculation or presumptions

unsupported by record evidence to avoid examining relevant evidence. *See, e.g., OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019); *Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007).

**C. Commerce Determinations Must Be in Accordance with Law**

Commerce's determination shall not be upheld if it is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Court must consider whether Commerce has acted consistently with the statute, exercised its discretion reasonably, and avoided acting in a manner that is arbitrary or capricious.

**1.      Commerce Must Act Consistently with the Statute**

Where Commerce has interpreted a provision of Title VII of the Tariff Act of 1930, the Court must "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). The Court starts its inquiry with the text and aims to determine its "ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up). "{W}hen the meaning of the statute's terms is plain," the Court's job is "at an end." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). When interpreting ambiguous statutes, the Court is not permitted to defer to Commerce, even on technical aspects of statutory interpretation, because "Congress expects courts to handle technical statutory questions." *Loper Bright*, 603 U.S. at 402. Instead, the Court is required to "use every tool at {its} disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400.

**2.      Commerce Cannot Act Arbitrarily and Capriciously**

If Commerce acts arbitrarily or capriciously, its determination is not in accordance with law. *See, e.g., Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017). The exercise of discretion does not excuse Commerce from its obligation to avoid arbitrary action.

8

*Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1337 (Ct. Int'l Trade 2010).  Commerce must engage in reasoned decision-making, by "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Commerce's duty not to act arbitrarily also requires it to act consistently with its past practice or articulate a reasoned explanation for departing from that practice.  *See, e.g., NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009); *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007).  Commerce cannot treat similar situations differently without providing adequate explanation.  *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## V.    Summary of Argument

Commerce's Final Determination suffers from numerous errors, each of which provides a separate basis to remand.  First, in valuing Shandong ConMet's inland freight expenses by relying on the World Bank's *Doing Business – Turkey* report, Commerce deviated from its practice and previous decisions regarding surrogate value selection without reasoned explanation.  As a result, Commerce unlawfully calculated an aberrational surrogate value for inland freight.  Second, in calculating the surrogate value for inland freight, Commerce unreasonably and unlawfully applied an adjustment to USD-denominated values based on inflation of the lira, which resulted in an erroneous calculation of the surrogate value.  Third, in calculating the surrogate value for brokerage and handling expenses, Commerce unreasonably and unlawfully applied the same erroneous adjustment to U.S.-dollar denominated values that distorted the calculation of the surrogate value.  Fourth, Commerce's reclassification of Shandong ConMet's scrap cast iron fields as byproducts instead of reintroduced inputs contradicts the record and Commerce's past decisions.

9

**VI.    Commerce's Final Determination Is Not Supported by Substantial Evidence or Otherwise Not in Accordance with Law**

**A.    Commerce's Decision to Value Shandong ConMet's Inland Freight Expenses Using Data from the World Bank's *Doing Business – Turkey* Report Was Unsupported by Substantial Evidence and Not in Accordance with Law**

In the Final Determination, Commerce determined that it was "appropriate to value inland freight based on data in the World Bank's *Doing Business Turkey* 2020 report" based on its practice of selecting data that are (1) broad market averages; (2) publicly available; (3) product specific; (4) tax and duty exclusive; and (5) contemporaneous with the POI. *Final IDM* at 12, P.R. 425. Commerce reasoned that the *Doing Business – Turkey* report more thoroughly satisfied these considerations than each of the alternative data sources on the record: (1) freight rates published by Hapag-Lloyd for a variety of routes in Turkey during the POI, (2) actual freight expenses for transporting subject merchandise incurred by Shandong ConMet's and ConMet's affiliate, ConMet de Mexico, during the POI, (3) freight data in the *Doing Business – Malaysia* report, and (4) freight rates published by Rani Transport for a variety of routes in Malaysia during the POI. *Final IDM* at 12-18, P.R. 425; Preliminary Decision Memo at 7, P.R. 357.

Despite conceding that the Hapag-Lloyd data are more contemporaneous with the POI than the *Doing Business – Turkey* data, Commerce declined to rely on the Hapag-Lloyd data for several reasons that are explained below. *Final IDM* at 12-15, P.R. 425. Commerce also declined to rely on ConMet de Mexico's actual freight expenses, for reasons explained below. *Final IDM* at 15-17, P.R. 425. And Commerce did not expressly state its reasoning for declining to rely on the *Doing Business – Malaysia* and Rani Transport data.

Commerce's decision to rely on the *Doing Business – Turkey* data is supported by neither substantial evidence nor law for two reasons: (1) Commerce's decision is inconsistent with its own

10

selection criteria, and (2) Commerce's decision unlawfully results in an aberrational surrogate value.

### 1. Substantial evidence and law do not support Commerce's decision because it is inconsistent with Commerce's own selection criteria.

#### a. The Doing Business – Turkey report does not meet Commerce's selection criteria.

Commerce explains that it valued inland freight using the *Doing Business – Turkey* report because it satisfied its practice of selecting surrogate values that are (1) reflective of broad market averages; (2) publicly available; (3) product specific; (4) tax and duty exclusive; and (5) contemporaneous with the POI. *Final IDM* at 12, P.R. 425; Policy Bulletin 04.1. However, Commerce concedes that the *Doing Business – Turkey* report does not satisfy at least two of its criteria. *Final IDM* at 12-15, P.R. 425.

First, Commerce concedes that the *Doing Business – Turkey* report is not contemporaneous with the POI. Commerce acknowledges that the *Doing Business – Turkey* report relies on data collected in May 2019, more than four years before the beginning of the POI, *Final IDM* at 18, P.R. 425, and that Commerce has previously determined that *Doing Business* reports that collected data in May 2019 are not sufficiently contemporaneous to use as surrogate values. *Final IDM* at 14, P.R. 425; *see Xanthan Gum From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments*; 2020-2021, 88 Fed. Reg. 9861 (Feb. 15, 2023), and accompanying Issues and Decision Memorandum at Comment 6 ("*Xanthan Gum 2020-21*"); *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2020-2021*, 87 Fed. Reg. 67,671 (Nov. 9, 2022), and accompanying Issues and Decision Memorandum at Comment 7 ("*Activated Carbon 2020-2021*"). However, Commerce does not explain how the selection of four-year-old data, instead of the more contemporaneous

11

data sources described below, is consistent with its practice of selecting surrogate values that are contemporaneous with the POI. As further explained in **Section VI.B**, the use of four-year-old data was particularly problematic given the hyperinflation caused by the loss in value of the Turkish lira, which resulted in Commerce applying a significant (and erroneous) inflation adjustment.

Second, Commerce all but concedes that the *Doing Business – Turkey* report does not represent a broad market average. Commerce acknowledges that the *Doing Business – Turkey* report includes one value based on only one route, far fewer than the number of freight rates and transportation routes included in the Hapag-Lloyd data (or the Rani Transport data that Commerce fails to discuss). *Final IDM* at 13, P.R. 425. In addition, Commerce acknowledges that it has previously determined that *Doing Business* inland freight data "are not based on a broad market average." *See Final IDM* at 14, P.R. 425; *Xanthan Gum 2020-21* at Comment 6. Nonetheless, Commerce concludes without elaboration that "the Doing Business Turkey 2020 report represents a broad market average." *Final IDM* at 13, P.R. 425.

Commerce is required to base its decision on the record as a whole, including record evidence that fairly detracts from its conclusions. By failing to consider record evidence demonstrating that the *Doing Business – Turkey* data are not contemporaneous with the POI and do not represent a broad market average, Commerce's decision to rely on these data is not supported by substantial evidence. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011).

Moreover, Commerce does not square the Final Determination with its previous determinations in *Xanthan Gum 2020-2021* and *Activated Carbon 2020-2021*. In these proceedings, Commerce explicitly declined to rely on *Doing Business* reports to value

12

respondents' inland freight expenses. Commerce argues that these determinations are inapposite to this case because Commerce discussed *Doing Business – Malaysia* instead of *Doing Business – Turkey*, and Commerce stated additional reasons in *Activated Carbon 2020-2021* for declining to use the *Doing Business* report. *Final IDM* at 14, P.R. 425. However, neither of these reasons engages with the substance of *Xanthan Gum 2020-2021* and *Activated Carbon 2020-2021*. The *Doing Business – Malaysia* and *Doing Business – Turkey* reports were published by the same organization, using data collected at the same time, and using the same methodology. *Final IDM* at 14, P.R. 425 (acknowledging that World Bank published both reports in 2020 and that each report examined the same merchandise). Commerce does not explain why it would apply different selection criteria to these nearly identical reports. In addition, Commerce's argument that it declined to use the *Doing Business* report in *Activated Carbon 2020-2021* for multiple reasons does not negate its determination in that review that the *Doing Business* "data are not contemporaneous with the POR." *Activated Carbon 2020-2021* at 46. Commerce is required to act consistently with its past practice or articulate a reasoned explanation for departing from that practice. *See, e.g.*, *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009). Because Commerce did not explain its reasons for departing from its past decisions, Commerce's selection of the *Doing Business – Turkey* report is not supported by substantial evidence.

b. <u>*Commerce erroneously determined that the Hapag-Lloyd data do not meet Commerce's selection criteria.*</u>

The record contains price lists published by Turkish transportation company Hapag-Lloyd that satisfy Commerce's selection criteria for the inland freight surrogate value. Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Additional Surrogate Value Comments* (Dec. 26, 2024) at Attach. 2, C.R. 323-327/P.R. 310 ("*ConMet's Additional Surrogate Value Comments*"). These data are publicly available,

13

contemporaneous with the POI, cover a broad range of routes throughout Turkey, cover all products including brake drums, and are duty and tax exclusive. *See id*. at Attach. 2, C.R. 323-327/P.R. 310; Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Shandong ConMet's Case Brief* (May 15, 2025) at 15-17, C.R. 492-494/P.R. 409 ("*ConMet's Case Brief*").

Commerce analyzes the Hapag-Lloyd data's suitability for selection in comparison to the *Doing Business – Turkey* report, but does not address whether the Hapag-Lloyd data satisfy Commerce's selection criteria on their own. *Final IDM* at 12-15, P.R. 425. Nonetheless, Commerce provides three reasons for declining to rely on the Hapag-Lloyd data, some of which relate to Commerce's selection criteria. *Final IDM* at 12-15, P.R. 425.

First, Commerce determined that the Hapag-Lloyd data are inappropriate because the data are specific to truck freight, whereas Shandong ConMet incurred truck and rail freight during the POI. *Final IDM* at 13, P.R. 425. However, Commerce does not explain how this reasoning fits into its selection criteria, which does not include specificity to mode of transportation. *Final IDM* at 13, P.R. 425; Policy Bulletin 04.1. Moreover, the *Doing Business – Turkey* data are also not specific to truck and rail freight, and Commerce did not explain why this factor is disqualifying for the Hapag-Lloyd data but not for the *Doing Business – Turkey* data. *See Xanthan Gum 2020-2021* at 28 ("it is unclear from the record whether the data {in *Doing Business* reports} are specific to truck freight or another transportation mode"). Furthermore, to the extent that Shandong ConMet used any rail freight, it was only for the last portion of transportation of finished goods from the factory to the port of export, and all of Shandong ConMet's input purchases (for which transportation costs were separately calculated) were transported via truck. *See* Memorandum from Samuel Frost to the File, *Verification of the Questionnaire Responses of Shandong ConMet*

14

*Mechanical Co., Ltd. in the Less-Than-Fair-Value Investigation of Certain Brake Drums from the People's Republic of China* (May 6, 2025) at 7, C.R. 485/P.R. 401.

Second, Commerce determined that the Hapag-Lloyd data do not represent a broad-market average because the public freight rates are "based on price quotations." *Final IDM* at 13-14, P.R. 425. However, the Hapag-Lloyd data are not simply price quotations that Hapag-Lloyd offered to a single customer for an individual transaction. *ConMet's Additional Surrogate Value Comments* at Attach. 2, C.R. 323-327/P.R. 310. Rather, Hapag-Lloyd publicly lists its prices on its website for several routes of varying distances throughout Turkey. *ConMet's Additional Surrogate Value Comments* at Attach. 2, C.R. 323-327/P.R. 310. It strains credulity to conclude that customers did not pay these prices, which remained in effect throughout the POI. *Cf. Final IDM* at 14, P.R. 425 (concluding that the Hapag-Lloyd data are "not based on actual, paid prices"). In any event, Commerce routinely relies on published price quotes and price schedules for transportation-related surrogate values. *See, e.g., Aluminum Lithographic Printing Plates From the People's Republic of China: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Affirmative Determination of Critical Circumstances*, 89 Fed. Reg. 79,256 (Sept. 27, 2024), and accompanying Issues and Decision Memorandum at Comment 2; *Xanthan Gum 2020-21* at Comment 6 (using price list from Rani Transport instead of World Bank *Doing Business* data); *Activated Carbon 2020-21* at Comment 7 (same). Therefore, the Hapag-Lloyd data would allow Commerce to calculate a broad market average of prices that remained in effect throughout the POI.

Third, Commerce determined that the Hapag-Lloyd data are less specific to the subject merchandise than the *Doing Business – Turkey* data. *Final IDM* at 13-14, P.R. 425. However, both data sources cover brake drums, but neither data source is specific to brake drums. Commerce is correct that the *Doing Business – Turkey* data are based on inland freight expenses for "Parts

and accessories of motor vehicles" classified in HTS heading 8708. However, HTS heading 8708 contains a wide variety of products that share little resemblance to brake drums, including seatbelts, windshields, and airbags. *Harmonized Tariff Schedule of the United States Revision 4 (2026)*, USITC Pub. 5711 at 87-16 – 87-26 (Feb. 2026). These products have disparate volumes, weights, and levels of fragility that can lead to variances in shipping costs. Likewise, the Hapag-Lloyd data also cover a wide range of merchandise, with no reason to believe that brake drums are excluded. *ConMet's Additional Surrogate Value Comments* at Attach. 2, C.R. 323-327/P.R. 310. Based on record evidence, Commerce's reasoning regarding product specificity is equally applicable to the Hapag-Lloyd data and *Doing Business – Turkey* data. Thus, substantial evidence does not support excluding the Hapag-Lloyd data for being insufficiently product specific.

Because the Hapag-Lloyd data satisfy Commerce's selection criteria, and the *Doing Business – Turkey* data do not satisfy Commerce's selection criteria, Commerce's decision to select the *Doing Business – Turkey* data instead of the Hapag-Lloyd data is not supported by substantial evidence.

Even if the Hapag-Lloyd data do not perfectly satisfy Commerce's selection criteria, Commerce does not explain why the flawed *Doing Business – Turkey* data are preferrable to the Hapag-Lloyd data. Commerce takes issue with certain aspects of the Hapag-Lloyd data but does not closely compare the significant flaws in the *Doing Business – Turkey* data to determine which source represents the best data available. For example, although Commerce critiques the Hapag-Lloyd data for being specific to truck freight, the *Doing Business – Turkey* report does not even specify the mode of transportation covered by the data. Any reasonable mind that conducted such a comparison would determine that the Hapag-Lloyd data are more appropriate for valuing the cost of transporting subject merchandise during the POI than the *Doing Business – Turkey* data.

    *c.* *Commerce erroneously determined that ConMet de Mexico's actual*
      *freight expenses do not meet Commerce's selection criteria.*

Alternatively, Commerce could have relied on ConMet's actual inland freight expenses in Mexico. Consolidated Plaintiffs submitted the inland freight expenses of ConMet de Mexico, and made the average figure public for use as a surrogate value for inland freight. Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Response to the Department's Supplemental Section A and C Questionnaire* (Dec. 19, 2024) at Exh. SC-33, C.R. 283-322/P.R. 302-305, 307 ("*ConMet's Supp. Sec. A&C Response*"); *ConMet's Case Brief* at 17-20, C.R. 492-494/P.R. 409. Consolidated Plaintiffs explained that these values are suitable for use as a surrogate value because (1) Mexico is an appropriate source country for the inland freight surrogate value, (2) the inland freight data satisfy Commerce's criteria for selection of surrogate values, and (3) the data are not aberrational. *ConMet's Case Brief* at 17-20, C.R. 492-494/P.R. 409; *see* Policy Bulletin 04.1. However, Commerce declined to rely on ConMet de Mexico's actual freight expenses for three reasons, none of which are persuasive. *Final IDM* at 15-17, P.R. 425.

First, Commerce declined to rely on a surrogate value from a source other than its primary surrogate country. *Final IDM* at 16, P.R. 425. Consolidated Plaintiffs agree that Commerce has a preference to source all surrogate values from a single surrogate country, where possible. 19 C.F.R. § 351.408(c)(2). However, when it is not possible to use surrogate values from the primary surrogate country, or the surrogate values from the primary surrogate country are deficient, Commerce relies on surrogate values from other countries at a comparable level of economic development. *See, e.g.*, Preliminary Decision Memo at 7, P.R. 357 (using Bulgarian data as the surrogate value for non-bituminous coal); *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1356 (Fed. Cir. 2020) ("Commerce has a practice of resorting to a secondary surrogate country if

17

data from the primary surrogate country is unavailable or unreliable.") (cleaned up); *Vinh Hoan Corp. v. United States*, 179 F. Supp. 3d 1208, 1228 (Ct. Int'l Trade 2016) (Regardless of Commerce's preference to value all factors of production using a single surrogate country, "the data from the primary surrogate country must also meet Commerce's stated data selection criteria."). As explained above, the *Doing Business – Turkey* report does not satisfy Commerce's selection criteria for valuing Shandong ConMet's inland freight expenses. Therefore, if Commerce also does not find the Hapag-Lloyd data to be suitable, it could and should find a surrogate value for inland freight from a country of comparable economic development, such as Mexico.

Second, Commerce determined that ConMet de Mexico's actual freight expenses are not an appropriate source to value Shandong ConMet's freight expenses because ConMet de Mexico's freight expenses are representative only of ConMet's expenses, rather than a broad market average. *Final IDM* at 15-16, P.R. 425. Consolidated Plaintiffs agree that Commerce typically requires surrogate values to represent a broad market average. Policy Bulletin 04.1. However, the basis of Commerce's practice is to accurately value the respondent's cost of production and movement expenses. 19 U.S.C. § 1677b(c)(1)(B). Unlike most investigations, the record of this proceeding contains actual expenses incurred by an affiliate of the mandatory respondent, Shandong ConMet, to transport subject merchandise in a country at a comparable level of economic development (i.e., Mexico). This is a rare instance in which a broad market average would not yield a more accurate value than a more limited dataset of actual expenses. By dismissing these data based on its general practice, Commerce contravenes the intent of the statute and its practice and disregards substantial evidence that could be used to value Shandong ConMet's inland freight expenses.

Third, Commerce declined to use ConMet de Mexico's freight data because invoices underlying the data are business proprietary information and not accompanied by English

translations. *Final IDM* at 16, P.R. 425. However, Consolidated Plaintiffs publicly disclosed in its case brief the inland freight expenses identified in the invoices. *ConMet's Case Brief* at 19, C.R. 492-494/P.R. 409. Commerce claims that it cannot rely on business proprietary information in the invoices underlying the publicly identified data. However, Commerce does not apply this standard to any other potential sources of inland freight surrogate values. For example, in selecting the *Doing Business – Turkey* data, Commerce did not review the proprietary underlying data collected by the World Bank but instead relied on the public headline number. *Final IDM* at 13, P.R. 425. Commerce does not provide a reasoned explanation regarding its inconsistent scrutiny of potential surrogate values. *See, e.g.*, *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009).

Even if ConMet de Mexico's expenses do not perfectly satisfy Commerce's selection criteria, Commerce again does not explain why the flawed *Doing Business – Turkey* data are preferrable to ConMet de Mexico's expense data. Commerce takes issue with certain aspects of ConMet de Mexico's expenses but does not closely compare the significant flaws in the *Doing Business – Turkey* data to determine which source represents the best data available. For example, although Commerce critiques ConMet de Mexico's data for not representing a broad market average, the *Doing Business – Turkey* data cover only a single route and therefore is hardly reflective of a broad market average either, while ConMet de Mexico's expenses are far more specific to the transportation of subject merchandise and far more contemporaneous with the POI. Any reasonable mind that conducted such a comparison would determine that ConMet de Mexico's actual expenses are more appropriate for valuing the cost of transporting subject merchandise during the POI than the *Doing Business – Turkey* data.

> d. *Commerce failed to address why the Doing Business – Turkey freight rate was a better surrogate value than the Malaysian freight rates on the record.*

For the reasons explained above, the Hapag-Lloyd data and ConMet de Mexico's actual expenses are the best information on the record to value Shandong ConMet's inland freight expenses. However, even if Commerce did not find these data sources to be appropriate surrogate values, Commerce could have relied on pricing information from Rani Transport, a Malaysian freight provider. The Rani Transport data satisfy Commerce's selection criteria, and Commerce has previously relied on Rani Transport data to value inland freight. *See* Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Pre-Preliminary Determination Comments* (Jan. 13, 2025) at 16-22, C.R. 402/P.R. 353; *Xanthan Gum 2020-2021* at Comment 6; *Activated Carbon 2020-2021* at Comment 7; *2,4-Dicholorphenoxyacetic Acid From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 90 Fed. Reg. 14,964 (Apr. 7, 2025) ("*2,4-D Final*"). If Commerce found other data sources to be unusable, it should have addressed the Rani Transport data in the Final Determination, rather than relying on the deeply flawed *Doing Business – Turkey* data. Commerce, however, fails to offer any explanation as to why it considered *Doing Business – Turkey* to be the best information available compared to the Rani Transport data, which renders its determination unsupported by substantial evidence and arbitrary. *State Farm*, 463 U.S. at 43 (failure to consider "an important aspect of the problem" renders a determination arbitrary); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) ("{T}hese determinations are not supported by substantial evidence" because the agency "failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations").

20

The record also contains freight data from the *Doing Business – Malaysia* report, which Commerce fails to address in the *Final IDM*. Because the *Doing Business – Malaysia* data rely on the same methodology and were collected at the same time as the *Doing Business – Turkey* data, the *Doing Business – Malaysia* data suffer from the same deficiencies as the *Doing Business – Turkey* data (i.e., lack of contemporaneity and failure to represent a broad market average). We therefore do not contend that the *Doing Business – Malaysia* data best satisfy Commerce's selection criteria for surrogate values among the potential surrogate values on the record. But because the *Doing Business – Malaysia* data are not aberrational like the *Doing Business – Turkey* data, which is an issue addressed further below, Commerce also erred in failing to address why the *Doing Business – Turkey* data are better than the *Doing Business – Malaysia* data.

### e.  Conclusion

Based on the record as a whole, no reasonable person would consider the World Bank's *Doing Business – Turkey* report to be the best available information for valuing Shandong ConMet's inland freight expenses. *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Therefore, Commerce's decision to rely on the *Doing Business – Turkey* report is not supported by substantial evidence. For the reasons explained above, Commerce's decision is also arbitrary and capricious, as Commerce failed to articulate a rational connection between its standard criteria for selection of surrogate values and its decision to select the *Doing Business – Turkey* data, which do not satisfy several of Commerce's criteria. *State Farm*, 463 U.S. at 43.

### 2.  Substantial evidence and law do not support Commerce's decision because it unlawfully results in an aberrational surrogate value.

Commerce's selection of the *Doing Business – Turkey* report suffers from a separate deficiency of relying an aberrationally high surrogate value relative to other inland freight data on the record. Commerce has acknowledged that aberrational values should not be used to value

FOPs.  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997).  Where there is evidence that data is aberrational, Commerce must address that evidence in order to demonstrate that the data is nonetheless the best information available.  *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  Commerce's usual practice for determining whether data is aberrational is to conduct a quantitative analysis, comparing either data from economically comparable countries or historical data from the country at issue to determine if the data are unreliable or an outlier.  *Tri Union Frozen Prods., Inc. v. United States*, 254 F. Supp. 3d 1290, 1296 (Ct. Int'l Trade 2017).

In the Final Determination, Commerce relied on a surrogate value of 0.0017 USD/KM/KG to value Shandong ConMet's inland freight expenses, which is many multiples higher than every other inland freight value on the record:

- The selected surrogate value is *nearly 20 times higher* than price schedules for Hapag-Lloyd for truck freight in Turkey during the POI, which have an average rate for exports of 0.0000877 USD/KM/KG and an average rate for imports of 0.0000848 USD/KM/KG.  *ConMet's Additional Surrogate Value Comments* at Attach. 2, C.R. 323-327/P.R. 310.

- The selected surrogate value is *more than 20 times higher* than price schedules for Rani Transport for truck freight in Malaysia, which have an average rate of 0.0000783 USD/KM/KG.  *ConMet's Additional Surrogate Value Comments* at Attach. 8-9, C.R. 323-327/P.R. 310.

- The selected surrogate value is *more than 10 times higher* than ConMet de Mexico's inland freight expenses during the POI, which have a value of 0.00015 USD/KM/KG.  *ConMet's Supp. Sec. A&C Response* at Exh. SC-33, C.R. 283-322/P.R. 302-305, 307.

- The selected surrogate value is *more than 6.5 times higher* than *Doing Business – Malaysia* data, which have an inflated value of 0.00026 USD/KG/KM.  Letter from Mayer Brown LLP to Sec'y of Commerce, *Certain Brake Drums from the People's Republic of China: Submission of Surrogate Value Comments* (Dec. 5, 2024) at Exh. 6, P.R. 277-278.

This Court and the Federal Circuit have determined that surrogate values with similar differences from other record sources are aberrational values that are not supported by substantial

22

evidence. For example, in *Jacobi Carbons AB v. United States*, 619 F. App'x 992 (Fed. Cir. 2015), the Federal Circuit indicated that prices that are 15 times higher than prices in other comparable countries are aberrational. In addition, this Court has required Commerce to exclude surrogate values that are significantly higher than comparable data on the record. *See Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 28 CIT 1185 (Ct. Int'l Trade 2004); *Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1367 (Ct. Int'l Trade 2009). Commerce did not address any of these cases in the Final Determination. *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007) (remanding because "Commerce did not attempt to explain why it acted contrary to" precedent).

Commerce's decision rests on its disregard for all other data sources on the record for inland freight. Commerce argues that "the record lacks suitable comparison points" because the aforementioned alternative data sources on the record are inappropriate comparisons. *Final IDM* at 17, P.R. 425. However, Commerce simply repeats its deficient reasons for not selecting each of these data sources for the surrogate value, without explaining why those factors are also relevant for assessing whether the selected surrogate value is aberrational. *Final IDM* at 17, P.R. 425. For example, Commerce does not explain why it is relevant that ConMet de Mexico's actual freight expenses do not represent a broad market average; as actual expenses incurred in a country of comparable economic development, these data points could certainly provide a reference point for whether the *Doing Business – Turkey* data reflect commercial reality. *Final IDM* at 17, P.R. 425. Similarly, even if the Hapag-Lloyd and Rani Transport data did not satisfy every one of Commerce's preferences for surrogate values in this specific investigation, they are still reliable data sources used in previous proceedings that serve as a point of comparison to Commerce's

23

selected surrogate value.  *See, e.g.*, *Xanthan Gum 2020-2021* at Comment 6; *Activated Carbon 2020-2021* at Comment 7; *2,4-D Final*.

Consolidated Plaintiffs recognize that a difference between the selected surrogate value and other sources on the record is not, by itself, evidence that the selected surrogate value is aberrational.  Rather, the significance of the deviation from the other values on the record is what makes the surrogate value aberrational and unusable.  No reasonable factfinder would determine that the market rate for truck freight is 10 or 20 times higher than what companies like Hapag-Lloyd or Rani Transport are publicly offering or what ConMet de Mexico incurred during the POI.  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  Moreover, Commerce does not attempt to explain or reconcile these values, simply assuming that the *Doing Business – Turkey* data are correct and all other sources are wildly incorrect, despite the other sources broadly being in line with each other.  *See OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("Mere speculation is not substantial evidence."); *Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where the agency's decision was based on "mere assumptions, which find no apparent support in record evidence").  The aberrational nature of Commerce's calculated freight rate derived from the *Doing Business – Turkey* report alone should be enough for the Court to conclude that substantial evidence does not support Commerce's determination that the *Doing Business – Turkey* constituted the best available evidence to accurately value Shandong ConMet's freight expenses.  Combined with the other significant flaws in the *Doing Business – Turkey* data described above, there can be no doubt that Commerce's determination to value Shandong ConMet's freight expenses with the *Doing Business – Turkey* data is unsupported by substantial evidence.

24

Commerce's selection of an aberrational surrogate value is also not in accordance with law for two reasons. Commerce ignored its legal obligation to calculate normal value as accurately as possible, which includes not selecting aberrational values as surrogate values. By failing to accurately value Shandong ConMet's cost of production and movement expenses, Commerce misapplied 19 U.S.C. § 1677b(c), 19 C.F.R. § 351.408(c), and this Court's legal precedent. Moreover, Commerce acts unlawfully not only when its actions are inconsistent with a statute or its regulations, but also when it acts arbitrarily. *See, e.g., Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will {also} be set aside if it is arbitrary and capricious." (alteration in original)). For the reasons explained above, Commerce failed to provide a rational connection between the facts found and the choice made when selecting an aberrational surrogate value for inland freight. *State Farm*, 463 U.S. at 43.

## B. Commerce's Calculation of Shandong ConMet's Surrogate Value for Inland Freight Expenses Was Unsupported by Substantial Evidence and Not in Accordance with Law

As a separate issue related to the inland freight surrogate value, Commerce erroneously adjusted the *Doing Business – Turkey* data for inflation in a manner that rendered the surrogate value inaccurate. *Final IDM* at 18-19, P.R. 425. Because the *Doing Business – Turkey* report is based on data collected in May 2019, Commerce "appl{ied} an 'inflator,' which is intended to account for inflation (or deflation), based on the producer price index (PPI), or wholesale price index, of the primary surrogate country in order to calculate an SV relevant to the POI." *Final IDM* at 18, P.R. 425. Despite dramatically different inflation rates in Turkey and the United States between May 2019 and the POI, Commerce "inflated the USD amounts reported in *Doing Business Turkey 2020* using a Turkish PPI." *Final IDM* at 18, P.R. 425.

Commerce's adjustment is supported by neither substantial evidence nor law because it resulted in the erroneous inflation of the surrogate value for inland freight, thereby contravening

25

Commerce's obligation to accurately calculate and value Shandong ConMet's cost of production and movement expenses.

### 1. Commerce's calculation was unsupported by substantial evidence because it erroneously inflated the surrogate value.

Consolidated Plaintiffs do not dispute that Commerce could apply an inflator to the inland freight surrogate value. However, contrary to its claims, Commerce's adjustment did not accurately account for inflation. Commerce's selected surrogate value for inland freight, derived from *Doing Business – Turkey*, is based on economic activity in Turkey in May 2019. Letter from Mayer Brown LLP to Sec'y of Commerce, *Certain Brake Drums from the People's Republic of China: Rebuttal Comments Regarding Selection of Surrogate Values* (Dec. 16, 2024) at Exh. 4 p.48, P.R. 294-296 ("*Webb's Rebuttal Surrogate Value Comments*"); *ConMet's Case Brief* at 22-23, C.R. 492-494/P.R. 409. Businesses that supplied information to the World Bank did so based on expenses incurred in lira, which the World Bank then converted to USD. *Webb's Rebuttal Surrogate Value Comments* at Exh. 4 p.48, P.R. 294-296; *ConMet's Case Brief* at 22-23, C.R. 492-494/P.R. 409. While the record supported an adjustment to account for inflation of the lira since 2019, the adjustment should have accounted for the surrogate value source's USD-denominated costs by converting the values back to lira before applying the lira-based inflator. The lira has suffered hyperinflation over the past several years, while the USD has not. *See* Memorandum from Samuel Frost to the File, *Final Decision Analysis Memorandum for Shandong ConMet Mechanical Co., Ltd.* (June, 13, 2025) at Attach. II, C.R. 499/P.R. 427 (exchange rates) ("*Final Analysis Memo*"); *ConMet's Case Brief* at 23, C.R. 492-494/P.R. 409. As a result, one USD would buy several times more lira in the POI (when the average exchange rate was 0.03 USD/lira) than it did in May 2019 (when the average exchange rate was 0.17 USD/lira). *See Final Analysis Memo* at Attach. II, C.R. 499/P.R. 427 (exchange rates); *ConMet's Case Brief* at 23, C.R. 492-494/P.R.

26

409. Using those exchange rates, one USD would purchase an item or service that cost 5.88 lira in May 2019, while during the POI, one USD would purchase an item or service that cost *33.33* lira. Thus, the relative increase in prices (i.e., inflation) on a USD basis would be roughly 1/6 the inflation level of prices reflected in lira, because a single USD would buy nearly six times as much lira during the POI as it did during May 2019.

Because the lira has become devalued relative to the USD since 2019, applying an inflator based on Turkish inflation to a 2019 USD value would yield a significantly higher value than applying the same inflator to a 2019 lira value, then converting to USD based on an exchange rate during the POI. The difference is significant, as shown below:

| Currency | Final Determination | ConMet Approach | Formulas |
|---|---|---|---|
| Freight Cost/KG/KM (2019 USD) | 0.000259 | 0.000259 | |
| 2019 USD/Lira Exchange Rate | N/A | 0.17 USD/Lira | |
| Freight Cost/KG/KM (2019 Lira) | N/A | 0.0015251 | 0.000259/0.17 |
| Lira-Based Inflator | 6.7426467 | 6.7426467 | |
| Inflated Freight Cost/KG/KM (POI Lira) | N/A | 0.0102829 | 0.0015251*6.7426467 |
| POI USD/Lira Exchange Rate | N/A | 0.3 USD/Lira | |
| Inflated Freight Cost/KG/KM (POI USD) | 0.0017481 | 0.00030849 | 0.0102829*0.03 |

As a result, given that Commerce's selected surrogate value from *Doing Business – Turkey* was already faulty (as discussed above), the inflation adjustment that Commerce applied made that surrogate value even more faulty. By applying a lira-based inflator to 2019 USD-denominated values, Commerce produced a surrogate value that does not accurately reflect the inflation-adjusted *Doing Business – Turkey* value in either 2024 lira or 2024 USD. The adjusted surrogate value does not reflect the inflation-adjusted value of the *Doing Business – Turkey* data in USD because the adjustment did not reflect the inflation rate of the USD, but instead reflected the much

27

higher inflation rate of the lira.  Moreover, the adjusted surrogate value does not reflect the inflation-adjusted value of the *Doing Business – Turkey* data in lira because it applied the lira-related inflation adjustment to an amount that was denominated in USD, rather than converting the USD amount to lira based upon contemporaneous exchange rates.  As a result, Commerce valued Shandong ConMet's inland freight expenses using a number that is untethered from the original data source.

Commerce's reasoning for applying a lira-based inflator to USD-denominated values is unavailing.  Notably, Commerce did not claim that its approach would yield an accurate surrogate value. *Final IDM* at 18-19, P.R. 425.  Instead, Commerce raised three justifications of its approach based on the *Fresh Warmwater Shrimp from Vietnam* 2012-2013 and 2014-2015 administrative reviews.  *Final IDM* at 18-19, P.R. 425.  First, Commerce claims that it has established a "long-standing, consistent practice" of applying inflators based on local currency to USD-denominated surrogate values.  *Final IDM* at 18-19, P.R. 425.  However, Commerce cites only two administrative reviews, both of which ended at least a decade ago.  *Final IDM* at 18-19, P.R. 425.  In any event, to the extent that Commerce has established a practice (which Consolidated Plaintiffs deny), Commerce's "statement of what it normally does or has done before . . . is not, by itself, an explanation of why its methodology comports the statute."  *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016).  Instead, Commerce is required to "ground such a normal or past practice in the statutory standard."  *Id*.  Commerce does not explain how its approach, which yielded inaccurate surrogate values, is consistent with the statute or supported by substantial evidence.

Second, Commerce argues that it applied its inflator to USD-denominated values because "the economic situation in the surrogate country is relevant to how we apply our inflator, and it is

28

not appropriate to reflect the economic situation in the United States." *Final IDM* at 19, P.R. 425. However, Commerce did not explain how Consolidated Plaintiffs' proposed approach of applying the inflator to lira, instead of USD, would reflect the economic situation in the United States. As explained above, applying the lira-based inflator to USD-denominated values ignores that hyperinflation in Turkey from 2019 to 2024 was related to the loss in value of the lira in Turkey, as evidenced by the significant change in the exchange rates between the lira and USD.

Third, Commerce argues that converting the *Doing Business – Turkey* data to 2019 lira and back to 2024 USD "would introduce unnecessary manipulation of the" data. *Final IDM* at 19, P.R. 425. Consolidated Plaintiffs agree that such a conversion may be unnecessary if the exchange rate in 2019 was the same as the exchange rate in 2024. However, in this case, the lira-USD exchange rate in 2019 was very different from the lira-USD exchange rate in 2024 due to hyperinflation in Turkey during that time period caused by the loss in value of the lira. Converting 2019 USD to 2019 lira, applying the inflator, and converting 2024 lira to 2024 USD would not yield the same result as applying the inflator to 2019 USD. Thus, converting the *Doing Business – Turkey* data to 2019 lira and back to 2024 USD is not "unnecessary manipulation," but rather is entirely necessary to calculate an accurate surrogate value. Commerce's failure to make the necessary adjustments resulted in a surrogate value that is facially aberrational compared to all of the other potential surrogate values on the record, including quotes for inland freight from Turkey during the POI, demonstrating that either the original surrogate value or Commerce's calculation methodology was seriously flawed.[1] To the extent that Commerce was concerned with the

---

[1] Notably, if ConMet's proffered methodology for addressing inflation were used, the resulting surrogate value of 0.00031 USD/KG/KM, while still higher than the other potential surrogate values on the record, would be far closer to the range of the other surrogate values (0.00008 to 0.00026 USD/KG/KM).

accuracy of the surrogate value given the "manipulation" that would be needed to avoid the clear distortion of applying a lira-based inflator to a USD value, that is another reason why Commerce never should have relied upon the outdated *Doing Business Report – Turkey* report in the first place.

Because the adjusted surrogate value for inland freight does not reflect the accurately inflated value of any record data source (including *Doing Business – Turkey*), the record does not contain "such relevant evidence as a reasonable mind might accept as adequate to support" Commerce's inflator. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). Commerce's inflator methodology is therefore unsupported by substantial evidence.

### 2. Commerce's calculation is inconsistent with its legal obligation to accurately value Shandong ConMet's factors of production and movement expenses.

Commerce's application of the inflator is not in accordance with law because Commerce did not follow its statutory and regulatory obligation to accurately value Shandong ConMet's factors of production and movement expenses. As explained in **Section VI.B.1**, Commerce applied a lira-based inflator to USD-based data, resulting in a surrogate value that does not accurately reflect the inflation-adjusted *Doing Business – Turkey* inland freight value in either lira or USD. As a result of the improper application of the inflator, the surrogate value for inland freight does not accurately value Shandong ConMet's cost of production and movement expenses. By failing to accurately value Shandong ConMet's cost of production and movement expenses, Commerce misapplied 19 U.S.C. § 1677b(c) and 19 C.F.R. § 351.408(c).

Moreover, Commerce acts unlawfully not only when its actions are inconsistent with a statute or its regulations, but also when it acts arbitrarily. *See, e.g., Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will {also} be set aside if it is arbitrary and capricious" (alteration in original)). For the reasons explained above,

30

Commerce failed to provide a rational connection between the facts found and the choice made when applying an inflator for lira to a value denominated in USD. *State Farm*, 463 U.S. at 43.

### C. Commerce's Calculation of Shandong ConMet's Surrogate Value for Brokerage and Handling Expenses Was Unsupported by Substantial Evidence and Not in Accordance with Law

Commerce relied on *Doing Business – Turkey* to value Shandong ConMet's brokerage and handling expenses. *Final IDM* at 18-19, P.R. 425. For the same reasons as described in **Section VI.B**, Commerce applied an inflator to the U.S. dollar-denominated *Doing Business – Turkey* data based on inflation of Turkish lira from May 2019 through the POI. *Final IDM* at 18-19, P.R. 425.

For the reasons explained in **Section VI.B**, Commerce's adjustment of the surrogate value for brokerage and handling expenses is unsupported by substantial evidence and not in accordance with law. Specifically, by applying a lira-based inflator to 2019 USD-denominated values, Commerce produced a surrogate value that does not accurately reflect the inflation-adjusted *Doing Business – Turkey* value in either lira or USD. The adjusted surrogate value does not reflect the inflation-adjusted value of *Doing Business – Turkey* data in USD because the adjustment did not reflect the inflation rate of the USD, but instead reflected the much higher inflation rate of the lira. Moreover, the adjusted surrogate value does not reflect the inflation-adjusted value of the *Doing Business – Turkey* data in lira because the adjustment did not reflect the relative changes in exchange rates of the lira and USD from 2019 to the POI. As a result, Commerce valued Shandong ConMet's brokerage and handling expenses using a number that is untethered from the original data source.

31

| Currency | Final Determination | ConMet's Approach | Formulas |
|---|---|---|---|
| Brokerage and Handling/KG (2019 USD) | 0.0262 | 0.0262 | |
| 2019 USD/Lira Exchange Rate | N/A | 0.17 USD/Lira | |
| Brokerage and Handling/KG (2019 Lira) | N/A | 0.1541176 | 0.0262/0.17 |
| Lira-Based Inflator | 6.7426467 | 6.7426467 | |
| Brokerage and Handling/KG (POI Lira) | N/A | 1.0391608 | 0.1541176*6.7426467 |
| POI USD/Lira Exchange Rate | N/A | 0.3 USD/Lira | |
| Brokerage and Handling/KG (POI USD) | 0.1766573 | 0.0311748 | 1.0391608*0.03 |

By failing to accurately value Shandong ConMet's cost of production and movement expenses, Commerce misapplied 19 U.S.C. § 1677b(c) and 19 C.F.R. § 351.408(c).  Moreover, because the adjusted surrogate value for brokerage and handling expenses does not reflect the accurately inflated value of any record data source (including *Doing Business – Turkey*), Commerce's inflator methodology is unsupported by substantial evidence, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (requiring Commerce to base its decision on relevant evidence that reasonable mind might accept as adequate to support its conclusions), and also is arbitrary and capricious, *State Farm*, 463 U.S. at 43 (requiring Commerce to articulate a rational connection between facts found and the decision made).

**D. Commerce's Reclassification of Shandong ConMet's Scrap Cast Iron Fields as Byproducts Was Unsupported by Substantial Evidence and Not in Accordance with Law**

In the Preliminary Determination, Commerce correctly included Shandong ConMet's scrap cast iron fields as direct materials to calculate normal value.  This resulted in a lower cost of manufacturing, to which the surrogate financial ratios calculated by Commerce (overhead, selling general, and administrative ("SG&A") expenses, and profit) were applied.  However, in the Final Determination, Commerce "remov{ed} the reintroduced cast iron scrap offset from {its}

32

calculation of direct materials, and instead appl{ied} this offset to {normal value}, after the application of the surrogate financial ratios." *Final IDM* at 62, P.R. 425. As result, the surrogate financial ratios were applied to a higher cost of manufacturing, which resulted in a higher normal value.

Commerce reasoned that its practice for applying byproduct offsets "is analogous to reintroduced scrap and the fact that {Commerce} would expect the value of this reintroduced scrap to be captured in a company's cost of goods sold (COGS)." *Final IDM* at 62, P.R. 425. Commerce explained that Shandong ConMet "necessarily incurs overhead and SG&A expenses in selling or reintroducing" scrap cast iron, resulting in the double-counting of the scrap offset. *Id.* at 62, P.R. 425. Commerce declined to follow two previous decisions in which it classified reintroduced scrap materials as direct materials. *Id.* at 62-63, P.R. 425. Commerce explained that these decisions were inapposite because the respondents in those proceedings reported a single direct material field that included both the input and the reintroduced scrap, whereas Shandong ConMet reported the input and reintroduced scrap in separate fields. *Id.* at 62-63, P.R. 425.

Commerce's reclassification of Shandong ConMet's scrap cast iron fields is supported by neither substantial evidence nor law for two reasons. First, the record contravenes Commerce's treatment of reintroduced scrap cast iron as a byproduct instead of a direct material. Second, Commerce did not provide a reasoned explanation for deviating from its previous decisions.

### 1. *Substantial evidence does not support Commerce's reclassification of scrap cast iron.*

Commerce's decision contradicts the record, which demonstrates that Shandong ConMet's scrap cast iron is not sold as a byproduct. In its normal practice, Commerce classifies scrap metals as direct materials if they are reintroduced into the production process, but not if they are sold to third parties. *See, e.g., Cast Iron Soil Pipe Fittings From the People's Republic of China: Final*

*Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 83 Fed. Reg. 33,205 (July 17, 2018), and accompanying Issues and Decision Memo at Comment 5 ("*CISPF from China*").  For example, in *Graphite Electrodes from China*, the Department explained that forming scrap was adequately represented in the FOP buildup by other inputs because "creation of forming scrap and the inclusion of the reintroduced forming scrap from an earlier processing run of the identical recipes cancel out one another."  *Small Diameter Graphite Electrodes From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 62,474 (Sept. 9, 2016), and accompanying Issues and Decision Memo at Comment 6 ("*Small Diameter Graphite Electrodes from China*").  Similarly, in *CISPF from China*, the Department determined that cast iron scrap was reflected in the direct materials in the cast iron input and should not be classified as a byproduct.  *CISPF from China* at Comment 5.

Shandong ConMet's reported cast iron scrap fields reflect the impact on the cost of manufacturing of reintroducing the scrap into the production process—namely, the reduction in the quantity of raw material that Shandong ConMet would otherwise need to purchase in order to manufacture subject merchandise.  Therefore, consistent with its practice, Commerce should have reflected Shandong ConMet's commercial reality by classifying these recycled inputs as direct materials.  However, Commerce erroneously reclassified Shandong ConMet's scrap cast iron fields as byproducts with two flawed justifications.

First, Commerce reasons that its practice for applying byproduct offsets "is analogous to reintroduced scrap and the fact that {Commerce} would expect the value of this reintroduced scrap to be captured in a company's cost of goods sold (COGS)." *Final IDM* at 62, P.R. 425.  Commerce asserts that Shandong ConMet "necessarily incurs overhead and SG&A expenses in selling or

34

reintroducing" scrap cast iron, resulting in the double-counting of the scrap offset. *Id.* at 62, P.R. 425. Commerce cites several prior determinations in which it addressed the treatment of *revenue* from scrap or byproducts. *Id.* at 62 nn. 342, 343, 345, P.R. 425.

However, contrary to the Department's assertion, reintroduced scrap is not analogous to scrap byproducts. Byproducts are similar to reintroduced materials in that they are produced in the respondent's manufacturing process; however, they are used differently, resulting in different effects on COGS and incursion of overhead and SG&A expenses. Byproducts are not reintroduced into the production process, but are instead discarded or sold to third parties. As a result, byproducts do not necessarily reduce COGS, but instead may generate revenue through sales, which necessarily requires the incursion of overhead and SG&A expenses. By contrast, reintroducing materials directly affects the cost of manufacturing subject merchandise by reducing the quantity of the material the company must purchase for the production process.

For example, if a company (like Shandong ConMet) introduces 10 kg of cast iron for each production run, but 5 kg of that 10 kg of cast iron was recycled from the prior production run and each production run creates 5 kg of scrap cast iron that is reintroduced into the next production run, the actual procurement cost of the raw materials consumed for each production would be only the cost of 5 kg of cast iron. Commerce's methodology, however, would assume that the actual cost of every production run includes the cost of purchasing 10 kg of cast iron, which is incorrect. The company does not sell reintroduced materials, and thus does not incur overhead and SG&A expenses to a greater extent than for purchasing other direct materials, and Commerce has specifically rejected the argument that the cast iron scrap should be classified as a byproduct just to prevent financial ratios from being "applied to material costs but not the byproduct offset." *CISPF from China* at 21.

35

Commerce calculated financial ratios by dividing the overhead, SG&A, and profit amounts of the surrogate company over that company's cost of raw materials, energy, and labor, and the company's raw material costs were based upon its COGS. Memorandum from Samuel Frost to the File, *Surrogate Values for the Final Determination* (June 13, 2025) at Attach. 7, P.R. 433-434; Letter from Akin Gump Strauss Hauer & Feld LLP to Sec'y of Commerce, *Brake Drums from the People's Republic of China: Comments on Surrogate Values* (Dec. 5, 2024) at Attach. 9, P.R. 273-276. As explained above, the use of recycled inputs directly impacts the amount of raw material that needs to be purchased in order to produce finished goods, and there is no basis to conclude that the COGS used in the surrogate financial ratios reflected something other than the cost of procuring raw materials for production when there is no procurement cost associated with recycled raw materials.[2] The cost of manufacturing in the surrogate financial ratio calculations therefore reflects the value of the net amount of the raw material consumed, and Shandong ConMet's cost of manufacturing to which the surrogate financial ratios are applied similarly should reflect only the value of the net amount of raw material consumed. Commerce, however, applied the surrogate financial ratios to a value that is associated with more than the amount of total raw material actually consumed.

Second, Commerce declines to follow *CISPF from China* and *Small Diameter Graphite Electrodes from China*. *Final IDM* at 62-63, P.R. 425. Commerce argues that these decisions were inapposite because the respondents in those proceedings reported a single direct material field that included both the input and the reintroduced scrap, whereas Shandong ConMet reported the input and reintroduced scrap in separate fields. *Id.* at 62-63, P.R. 425. However, Commerce does not

---

[2] To the extent that additional processing would be needed in order to reuse the recycled material, such processing would be captured in the labor and electricity expenses.

explain the relevance of its distinction. In *CISPF from China* and *Small Diameter Graphite Electrodes from China*, the respondents' total input volumes were necessarily reduced by the reintroduction of scrap materials. Similarly, Shandong ConMet's reintroduction of scrap cast iron reduced the required volume on its cast iron input in the production process. The only difference between this case and Commerce's precedent is that Shandong ConMet divided its reporting fields into initial inputs and scrap inputs, whereas the respondents in *CISPF from China* and *Small Diameter Graphite Electrodes from China* collapsed those fields. Whether the scrap is netted against the initial inputs in a single field or the scrap is reported in a separate field that is netted against the initial inputs reported in another field, mathematically, the consumption of purchased direct materials is the same. The differences in reporting format do not alter Shandong ConMet's cost of manufacturing, and treating the situations differently would arbitrarily assign a cost of manufacturing to Shandong ConMet that is inconsistent with cost of manufacturing information on the record.

Because the record demonstrates that Shandong ConMet reintroduced scrap cast iron into its production process, Commerce did not base its reclassification of reintroduced scrap cast iron as a byproduct on "such relevant evidence as a reasonable mind might accept as adequate to support" that conclusion. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). Therefore, Commerce's reclassification is not supported by substantial evidence. Moreover, Commerce's decision is not supported by substantial evidence because Commerce did not to follow its precedent, *CISPF from China* and *Small Diameter Graphite Electrodes from China*, with only a cursory, unpersuasive distinction. *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007).

### *2.   Commerce's reclassification is not in accordance with law.*

Commerce's reclassification of Shandong ConMet's scrap cast iron fields is also not in accordance with law for two reasons.  For the reasons explained above, Commerce's decision is inconsistent with its longstanding practice, in which it classifies scrap metals as direct materials if they are reintroduced into the production process, but not if they are sold to third parties.  *See, e.g., CISPF from China* at Comment 5.  By misclassifying Shandong ConMet's scrap cast iron as a byproduct, Commerce misapplied 19 U.S.C. § 1677b(c), 19 C.F.R. § 351.408(c), and relevant precedent.  Moreover, Commerce's reclassification is arbitrary and capricious because Commerce did not act consistently with its decisions in *CISPF from China* and *Small Diameter Graphite Electrodes from China*, but offered "insufficient reasons for treating similar situations differently." *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

## VII.   Conclusion

For the foregoing reasons, we respectfully request that the Court grant Consolidated Plaintiffs' motion for judgment on the agency record and remand this matter to Commerce for disposition in a manner consistent with the judgment of this Court.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
Daniel M. Witkowski
Julia K. Eppard
Paul S. Bettencourt
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4046
E-mail: mnicely@akingump.com
*Counsel for ConMet and Shandong ConMet*

Dated: March 23, 2026

38

## CERTIFICATE OF COMPLIANCE

I, Matthew R. Nicely, an attorney with Akin Gump Strauss Hauer & Feld LLP, certify that Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record contains 11,639 words (according to the word count feature of the Microsoft Word processing program) and therefore complies with the word count limitation set forth in Paragraph 2(B)(1)(a) of the Standard Chambers Procedures of the Court.

Dated: March 23, 2026                                 /s/ Matthew R. Nicely
                                                      Matthew R. Nicely
                                                      AKIN GUMP STRAUSS HAUER & FELD LLP

                                                      *Counsel for ConMet and Shandong ConMet*