**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

WEBB WHEEL PRODUCTS, INC.,

Plaintiff,

and,

CONSOLIDATED METCO, INC. and SHANDONG CONMET MECHANICAL CO., LTD.,

Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and,

CONSOLIDATED METCO, INC. and SHANDONG CONMET MECHANICAL CO., LTD.,

Defendant-Intervenors,

and,

WEBB WHEEL PRODUCTS, INC.,

Consolidated Defendant-Intervenor.

Court No. 25-00207
[redacted]

DEFENDANT'S RESPONSE TO PLAINTIFF AND CONSOLIDATED PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 305-768
Email: sosun.bae@usdoj.gov

OF COUNSEL:

ELLIOTT BREWER
Attorney
Department of Commerce
Office of Chief Counsel
for Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

August 14, 2026

Attorneys for Defendant

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 .......... 2

I. The Administrative Determination Under Review .......... 2

II. Issues Presented for Review .......... 2

STATEMENT OF FACTS .......... 3

SUMMARY OF THE ARGUMENT .......... 9

ARGUMENT .......... 10

I. Standard of Review .......... 10

II. Legal Framework for Surrogate Value Selection .......... 11

III. Commerce's Determination to Use Turkish Tariff Schedule Subheading 3801.10 ("Artificial Graphite") to Determine the Surrogate Value of ConMet's Recarburizing Agent Was Lawful and Supported by Substantial Evidence .......... 12

IV. Commerce's Selection of the *Doing Business – Turkey 2020* Report to Determine the Surrogate Value for ConMet's Inland Freight and B&H Expenses Was Lawful and Supported by Substantial Evidence .......... 17

A. Commerce Reasonably Determined That the *Doing Business – Turkey 2020* Report Was the Best Available Information on the Record .......... 17

B. ConMet Cannot Show That the *Doing Business – Turkey 2020* Report Was So Inferior to the Other Choices That No Reasonable Mind Could Accept It .......... 23

1. The Hapag-Lloyd Data .......... 23

2. The Conmet de Mexico Data .......... 27

3. The Rani Transport and *Doing Business – Malaysia 2020* Data .......... 31

C. Commerce Did Not Err in Its Calculation of the Surrogate Value for Inland Freight and B&H Expenses .......... 33

1. Commerce's Application of an Inflator Was Consistent with its Normal Practice and Adequately Explained .......... 33

2. Commerce's Surrogate Value Calculation Was Consistent with its Statutory and Regulatory Obligations .......... 39

V. Commerce's Determination to Treat Certain Scrap Fields as Offsets to Normal Value Was Lawful and Supported by Substantial Evidence .................................. 40

CONCLUSION .................................................................................................... 43

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ad Hoc Shrimp Trade Action Committee v. United States*,
618 F.3d 1316 (Fed. Cir. 2010)........................................................................................ 43

*An Giang Fisheries Import & Export Joint Stock Company v. United States*,
203 F. Supp. 3d 1256 (Ct. Int'l Trade 2017) ...................................................................... 22

*Anshan Iron & Steel Co., Ltd. v. United States*,
27 Ct. Int'l Trade 1234 (Ct. Int'l Trade 2003)..................................................................... 20

*Arnold P'ship v. Dudas*,
362 F.3d 1338 (Fed Cir. 2004)........................................................................................... 39

*Ashley Furniture Indus., LLC v. United States,*
607 F. Supp. 3d 1210 (Ct. Int'l Trade 2022) ...................................................................... 20

*Biestek v. Berryhill*,
587 U.S. 97 (2019)............................................................................................................. 10

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974)........................................................................................................... 32

*Catfish Farmers of Am. v. United States*,
No. 12-00087, 2016 WL 1268196 n.5 (Ct. Int'l Trade Mar. 30, 2016).................................. 22

*Catfish Farmers of America v. United States*,
No. 12-00087, 2014 WL 7181359 (Ct. Int'l Trade Dec. 18, 2014)........................................ 25

*China First Pencil Co. v. United States,*
721 F. Supp. 2d 1369 (Ct. Int'l Trade 2010) ................................................................ 11, 17

*Clearon Corp. v. United States*,
2013 WL 646390 (Ct. Int'l Trade Feb. 20, 2013)................................................................ 12

*Conn. Steel Corp. v. United States*,
462 F. Supp. 2d 1322 (Ct. Int'l Trade 2006) ...................................................................... 21

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938)....................................................................................................*passim*

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966)..................................................................................................... 10, 16

*CS Wind Vietnam Co. v. United States*,
832 F.3d 1367 (Fed. Cir. 2016)........................................................................................ 35

*Dorbest Ltd. v. United States*,
462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ................................................................. 38

*DuPont Teijin Films China Ltd. v. United States*,
7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ..................................................................... 42

*Fine Furniture (Shanghai) Limited v. United States*,
353 F. Supp. 3d 1323 (Ct. Int'l Trade 2018) ................................................................. 12

*Goldlink Indus. Co. v. United States*,
30 C.I.T. 616, 431 F. Supp. 2d 1232 (2006) ........................................................... *passim*

*Heze Huayi Chemical Co., Ltd. v. United States*,
2018 WL 2328183 (Ct. Int'l Trade May 22, 2018) ........................................................ 38

*Husteel Co., Ltd. v. United States*,
98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ................................................................... 31

*Jacobi Carbons AB v. United States*,
992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014), *aff'd*, 619 F. App'x 992 (Fed. Cir. 2015).... 20, 21

*Jiaxing Bro. Fastener Co. v. United* States,
11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) ....................................................... 12, 28, 29

*Lifestyle Enterprise, Inc. v. United States*,
751 F.3d 1371 (Fed. Cir. 2014)........................................................................................ 22

*Mittal Steel Galati S.A. v. United States*,
502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007) ................................................................. 38

*National Labor Relations Board v. Nevada Consolidated Copper Corp.*,
316 U.S. 105 (1942)......................................................................................................... 16

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006)........................................................................................ 11

*Peer Bearing Co. v. United States*,
182 F. Supp. 2d 1285 (Ct. Int'l Trade 2001) ........................................................... 27, 28

*Pirelli Tyre Co., Ltd. v. United States*,
128 F.4th 1265 (Fed. Cir. 2025) ................................................................................ 31, 32

*QVD Food Co. v. United States,*
721 F. Supp. 2d 1311 (2010), *aff'd,* 658 F.3d 1318 (Fed. Cir. 2011) ...................................... 11

*Risen Energy Co., Ltd. v. United States*,
477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) ............................................................................ 22

*SeAH Steel VINA Corporation v. United States*,
950 F.3d 833 (Fed. Cir. 2020)..................................................................................................... 10

*Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*,
268 F.3d 1376 (Fed. Cir. 2001).................................................................................................... 43

*Shandong Huarong Gen. Corp. v. United States*,
159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ................................................................................ 43

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005).................................................................................................... 39

*Timken Co. v. United States,*
166 F. Supp. 2d 608 (Ct. Int'l Trade 2001) ................................................................................ 11

*Timken Co. v. United States*,
699 F. Supp. 300 (Ct. Int'l Trade 1988) ...................................................................................... 11

*Tri Union Frozen Products, Inc. v. United States*,
227 F. Supp. 3d 1387 ................................................................................................................... 37

*Vinh Quang Fisheries Corp. v. United States*,
637 F. Supp. 2d 1352 (Ct. Int'l Trade 2009) ............................................................................... 25

*Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. U.S.*,
2004 WL 1918933 (Ct. Int'l Trade Aug. 26, 2004)................................................................... 27

**Statutes**

19 U.S.C. § 1516a(b) ................................................................................................................... 10

19 U.S.C. § 1677b(c) ............................................................................................................ *passim*

**Rules**

Ct. Int'l Trade R. 56.2 .................................................................................................................... 1

**Regulations**

19 C.F.R. § 351.408(c)....................................................................................... *passim*

**Administrative Determinations**

*Cast Iron Soil Pipe Fittings from the People's Republic of China*,
83 Fed. Reg. 33,205 (Dep't of Commerce July 17, 2018)................................................ 40, 41

*Certain Activated Carbon from the People's Republic of China*,
87 Fed. Reg. 67,671 (Dep't of Commerce Nov. 9, 2022)....................................................... 18

*Certain Brake Drums from the People's Republic of China*,
90 Fed. Reg. 8,383 (Dep't of Commerce Jan. 29, 2025) ......................................................... 5

*Certain Brake Drums from the People's Republic of China*,
90 Fed. Reg. 26,011 (Dep't of Commerce June 18, 2025) .................................................. 2, 6

*Certain Brake Drums from the People's Republic of China; Correction*,
90 Fed Reg. 29,530 (Dep't of Commerce July 3, 2025)....................................................... 2, 6

*Certain Brake Drums from the People's Republic of China and the Republic of Türkiye*,
89 Fed. Reg. 58,116 (Dep't of Commerce July 17, 2024)........................................................ 3

*Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*,
69 Fed. Reg. 71,005 (Dep't of Commerce Dec. 8, 2004) ....................................................... 30

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*,
79 Fed. Reg. 65,377 (Dep't of Commerce Nov. 4, 2014) ................................................ 33, 34

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*,
81 Fed. Reg. 62,717 (Dep't of Commerce Sep. 12, 2016) ........................................ 33, 34, 37

*Certain Steel Racks and Parts Thereof from the People's Republic of China*,
89 Fed. Reg. 25,235 (Dep't of Commerce Apr. 10, 2024) ..................................................... 34

*Fresh Garlic from the People's Republic of China*,
75 Fed. Reg. 61,130 (Dep't of Commerce Oct. 4, 2010)........................................................ 33

*Non-Frozen Apple Juice Concentrate from the People's Republic of China*,
69 Fed. Reg. 65,148 (Dep't of Commerce Nov. 3, 2004)....................................................... 33

*Small Diameter Graphite Electrodes from the People's Republic of China*,
81 Fed. Reg. 62,474 (Dep't of Commerce Sep. 9, 2016) .................................................. 40, 42

*Steel Wire Garment Hangers from the People's Republic of China*,
80 Fed. Reg 69,942 (Dep't of Commerce Nov. 12, 2015)................................................. 25, 36

*Xanthan Gum from the People's Republic of China*,
88 Fed. Reg. 9861 (Dep't of Commerce Feb. 15, 2023) ......................................................... 18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | | |
|---|---|---|
| WEBB WHEEL PRODUCTS, INC., | ) | |
| Plaintiff, | ) | |
| and, | ) | |
| CONSOLIDATED METCO, INC. and SHANDONG CONMET MECHANICAL CO., LTD., | ) | |
| Consolidated Plaintiffs, | ) | |
| v. | ) | Court No. 25-00207 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and, | ) | |
| CONSOLIDATED METCO, INC. and SHANDONG CONMET MECHANICAL CO., LTD., | ) | |
| Defendant-Intervenors, | ) | |
| and, | ) | |
| WEBB WHEEL PRODUCTS, INC., | ) | |
| Consolidated Defendant-Intervenor. | ) | |

**PROPOSED ORDER**

Upon consideration of plaintiffs' motions for judgment upon the agency record, defendant's and defendant-intervenors' responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated: _____________, 2026
New York, NY

_________________________
Senior Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

WEBB WHEEL PRODUCTS, INC.,

Plaintiff,

and,

CONSOLIDATED METCO, INC. and SHANDONG CONMET MECHANICAL CO., LTD.,

Consolidated Plaintiffs,

v.

UNITED STATES,

Defendant,

and,

CONSOLIDATED METCO, INC. and SHANDONG CONMET MECHANICAL CO., LTD.,

Defendant-Intervenors,

and,

WEBB WHEEL PRODUCTS, INC.,

Consolidated Defendant-Intervenor.

Court No. 25-00207

[redacted]

**DEFENDANT'S RESPONSE TO PLAINTIFF AND CONSOLIDATED PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motions for judgment on the agency filed by plaintiff Webb Wheel Products, Inc. (Webb Wheel) and consolidated plaintiffs Metco, Inc.,

and Shandong ConMet Mechanical, Co., Ltd. (ConMet). *See* Webb Wheel Br., ECF No. 39; ConMet Br., ECF No. 37. Plaintiffs challenge various aspects of the Department of Commerce's (Commerce) final determination in the less-than-fair-value investigation of certain brake drums from the People's Republic of China (China). As demonstrated below, Commerce's final determination is supported by substantial evidence and in accordance with law. Accordingly, we respectfully request that the Court deny plaintiffs' motions and enter judgment for the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I. The Administrative Determination Under Review

Webb Wheel and ConMet challenge Commerce's final determination in the less-than-fair-value investigation of certain brake drums from China. *See Certain Brake Drums from the People's Republic of China*, 90 Fed. Reg. 26,011 (Dep't of Commerce June 18, 2025) (final determination) (P.R. 437), as corrected in *Certain Brake Drums from the People's Republic of China; Correction*, 90 Fed Reg. 29,530 (Dep't of Commerce July 3, 2025) (P.R. 439), and accompanying Issues and Decision Memorandum (IDM) (P.R. 425).

### II. Issues Presented for Review

1. Whether Commerce's decision to use Turkish tariff schedule subheading 3801.10 ("Artificial Graphite") in determining the surrogate value of ConMet's recarburizing agent was supported by substantial evidence and in accordance with law.

2. Whether Commerce's decision to use the World Bank's the *Doing Business – Turkey* report in determining the surrogate value of ConMet's domestic inland freight and brokerage and handling (B&H) was supported by substantial evidence and in accordance with law.

3. Whether Commerce's decision to adjust for inflation by using U.S. Dollar (USD) values, rather than converting the values to the Turkish lira, in determining the surrogate value of ConMet's domestic inland freight and B&H was supported by substantial evidence and in accordance with law.

4. Whether Commerce's decision to treat certain scrap fields as offsets to normal value in the margin calculations was supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On July 10, 2024, Commerce initiated a less-than-fair-value investigation of brake drums from China. *See Certain Brake Drums from the People's Republic of China and the Republic of Türkiye*, 89 Fed. Reg. 58,116 (Dep't of Commerce July 17, 2024) (P.R. 35). On August 26, 2024, Commerce selected ConMet as one of the mandatory respondents in the investigation and issued an initial questionnaire. *See* Aug. 26, 2024 Respondent Selection Memo (P.R. 149, C.R. 91); ConMet Questionnaire (P.R. 154)

When investigating imports from a non-market economy country, Commerce generally determines whether a respondent's sales of subject merchandise were made at less than fair value by comparing a constructed export price to the normal value. Both petitioner Webb Wheel and ConMet advocated in favor of selecting Türkiye as the primary surrogate country, and Commerce indeed selected Türkiye. *See* Webb Wheel SV Rebuttal Comments" (P.R. 281); ConMet SV Comments (P.R. 273).

ConMet also submitted data for Commerce to value its various factors of production (FOP) and surrogate values. In its response to questionnaires regarding its FOPs, ConMet detailed its use of cast iron and explained that "cast iron scrap generated during the production

process was reintroduced back into the production of the {subject merchandise}." ConMet Section D Response at 10 (P.R. 225) (C.R. 205). ConMet reported this iron scrap as a distinct input and no party challenged this classification. *See* ConMet Supp. Section D Response at Exh. SD-1f (P.R. 332); IDM at 63.

In its surrogate value comments, ConMet certified that it used a "graphitized recarburizer" in the manufacturing process. According to the Chinese ferrous metallurgy industry standard, "graphitized recarburizer" involves a high temperature graphitization process of petroleum coke. ConMet Additional SV Comments at 3 (P.R. 316). While ConMet had initially advocated for Commerce to use Turkish tariff schedule subheading 2713.12 ("Petroleum Coke, Calcined") to value its graphitized recarburizer, the company also acknowledged that subheading 3801.10 was a reasonable choice for valuing the input. ConMet Final SV Comments at 3-4 (P.R. 316). ConMet reiterated this point in its ministerial error allegation. ConMet Ministerial Error Comments at 6 (P.R. 373)

ConMet additionally submitted surrogate value data for its cost of domestic inland freight and B&H expenses. Conmet initially proposed using the World Bank's *Doing Business – Turkey 2020* report—a USD-denominated dataset—to value both inland freight and B&H expenses. ConMet SV Comments at Att. 10-11 (P.R. 275). When surrogate value data are not contemporaneous with the period of investigation—here, October 1, 2023 through March 31, 2024—Commerce normally applies an "inflator" to account for inflation or deflation. IDM at 18. As such, ConMet calculated an inflator based on the Turkish producer price index (PPI). *Id.* at Att. 12 (P.R. 275-276). ConMet then applied the Turkish PPI inflator directly to the *Doing Business – Turkey 2020* data to calculate its suggested inland freight and B&H expense surrogate values. *See id.* at Att. 1 (P.R. 273).

After proposing that Commerce use the *Doing Business – Turkey 2020* report, ConMet placed three additional sources of surrogate value data for inland freight on the record: (1) inland freight data from Hapag-Lloyd, an international shipping and transportation company; (2) Mexico truck rates from affiliate ConMet de Mexico; and (3) 2017 Malaysian truck freight data from Rani Transport, a trucking service provider. *See* Conmet Additional SV Comments at Att. 2, 8-9 (P.R. 317); Conmet Supp. Section A/C Response at Exh. SC-33 (P.R. 304). Petitioner Webb Wheel also placed inland freight data from the World Bank's *Doing Business in Malaysia – 2020* on the record. Petitioner SV Comments at Exh. 6-7 (P.R. 277).

On January 29, 2025, Commerce published its preliminary determination. *See Certain Brake Drums from the People's Republic of China*, 90 Fed. Reg. 8,383 (Dep't of Commerce Jan. 29, 2025) (preliminary determination) (P.R. 371), and accompanying Preliminary Issues and Decision Memorandum at 4 (PDM) (P.R. 357). Commerce preliminarily assigned ConMet an estimated weighted average dumping margin of 109.64 percent. Preliminary Determination, 90 Fed. Reg. at 8,383-84.

As part of its preliminary determination, Commerce selected various surrogate values to be used in the calculation of normal value. *See* SV for Preliminary Determination (P.R. 364-365). Commerce preliminarily valued ConMet's recarburizing agent using a Turkish HS subheading for natural graphite (HS 3801.90) ("Preparations Based On Graphite, Nesoi"). For ConMet's inland freight and B&H expenses, Commerce preliminarily relied on the *Doing Business – Turkey 2020* data that ConMet had first proposed. PDM at 24-25. Commerce applied an inflator by inflating the USD amounts using a Turkish PPI. IDM at 18; *see also* SV for Preliminary Determination at Exhs 6a-6b (P.R. 364-365). Finally, Commerce valued ConMet's

reintroduced cast iron scrap as an offset to its direct material FOPs. *See* Preliminary Analysis Memo for ConMet at 5 (P.R. 358) (C.R. 404).

Following its preliminary determination, Commerce verified ConMet's claim that it used artificial graphite as its recarburizing agent by examining randomly selected purchases. IDM at 22; ConMet Verification Report at 11 (P.R. 485, C.R. 401). The company's documentation, including invoices, accounting records, and inspection/testing certificates, consistently described the material as "graphitized" or otherwise referenced "graphitization." ConMet Verification Exhibits Part 10 at 71, 87, 100 (C.R. 472, C.R. 474). None of the reviewed purchase records referenced non-graphitized materials, natural graphite, or mixed-material products. *Id*.

Commerce published its final determination on June 18, 2025, assigning ConMet a weighted-average dumping margin of 77.14 percent (down from the 109.64 percent preliminary rate). 90 Fed. Reg. at 26,011-12.[1]

In its final determination, Commerce updated its treatment of cast iron scrap, deducting the scrap credit from normal value after applying the surrogate financial ratios for overhead, selling general and administrative expenses (SG&A), and profit. IDM at 62. Commerce explained that this approach is consistent with its longstanding practice and intended to prevent double counting. *Id*. Because the financial statements of the selected surrogate company, Tugecelik, did not separately identify scrap within its cost of goods sold (COGS), Commerce could not determine whether the value of reintroduced scrap had already been reflected in the surrogate financial ratios. *Id*. Commerce found that applying the scrap offset to direct materials

[1] On July 3, 2025, Commerce issued a correction to the scope of the investigation to reflect changes that Commerce made following the preliminary determination. *Certain Brake Drums from the People's Republic of China; Correction*, 90 Fed Reg. 29,530 (Dep't of Commerce July 3, 2025).

in these circumstances could thus overstate the benefit of the scrap by effectively counting it twice.

With regard to ConMet's recarburizing agent, Commerce changed its conclusion in the final determination upon evaluating the evidence following verification. *See* IDM at 19-20. In its final determination, Commerce observed that:

> ConMet: (1) reported that its recarburizing agent is graphitized graphite; (2) provided documentation that petroleum coke is the raw material from which this graphite is graphitized; (3) provided documentation that the defining characteristic of synthetic graphite is that it is graphitized; and (4) clarified that "synthetic" graphite and "artificial" graphite are the same material. From these facts, it is clear that Shandong ConMet reported that its recarburizing agent was artificial graphite produced from petroleum coke.

IDM at 22. Based on the record, Commerce concluded that the recarburizing agent purchases were artificial graphite and therefore used data covering artificial graphite (HS 3801.10) to value ConMet's recarburizing agent. *Id*. at 24.

Commerce did not revise the surrogate values for inland freight and B&H expenses, reasoning that the *Doing Business – Turkey 2020* dataset represented the best available information because it best satisfied the factors for choosing amongst the inland freight data options on the record. IDM at 17-18. While ConMet had argued that the Hapag-Lloyd and ConMet de Mexico truck rates were superior, Commerce explained that both alternatives were less appropriate for valuing inland freight than the *Doing Business – Turkey 2020* report. *Id.* at 15-18.

Addressing the Hapag-Lloyd truck rates, Commerce found that these data were inferior to the *Doing Business – Turkey 2020* report because: 1) the data did not show the actual rates charged, but instead comprised only price quotes that did not reflect actual, paid commercial prices; 2) the "truck freight only" nature of the data was not representative of ConMet's freight

usage because, despite failing to report it, ConMet had used rail transportation in addition to trucks; and 3) the previous determinations relied on by ConMet to support its claim that the Hapag-Lloyd data were more appropriate than the *Doing Business – Turkey 2020* data were inapposite. *Id*. at 12-14.

Next, Commerce evaluated the Mexican affiliate ConMet de Mexico's dataset, but found it unsuitable because: 1) the dataset did not show a broad market average but appeared to consist of documentation for a single freight invoice for a single company; 2) the dataset was not publicly available, and therefore inconsistent with the normal preference to rely on publicly available information pursuant to 19 C.F.R. § 351.408(c)(1); 3) the dataset was untranslated such that Commerce could not sufficiently analyze it; and 4) the dataset was from Mexico so relying on it would run contrary to Commerce's preference for valuing all FOPs from a single primary surrogate country—here, Türkiye. *Id*. at 15-17.

Commerce also found the Malaysian Rani Transport data proposed by Conmet were from 2017, two years further removed from the period of investigation than the *Doing Business – Turkey 2020* report, and not representative of a broad market average because they reflected pricing from a only a single company. *Id*. at 17.

Commerce then addressed Conmet's argument that the *Doing Business – Turkey 2020* data were aberrational, observing that higher prices were not, by themselves, an adequate basis for determining the data to be aberrational. Commerce also explained that the alternative datasets were not suitable surrogate values and therefore were not reliable and appropriate points of comparison. *Id.* at 17.

Finally, Commerce rejected Conmet's argument that it had improperly applied an inflator based on Turkish lira to surrogate values denominated in USD instead of converting the USD

values to lira before applying the inflator. *Id.* at 18. Commerce explained that adjusting data for inflation was consistent with its longstanding practice and intended to avoid unnecessary data manipulation. *Id*. Based on the available record information, Commerce determined that deviating from its "long-standing, consistent practice {} is unsupported by record evidence" and declined to revise the inflator calculation. *Id. at* 19.

## SUMMARY OF THE ARGUMENT

Substantial evidence supports Commerce's selection of Turkish tariff schedule subheading 3801.10 ("Artificial Graphite") data to value ConMet's recarburizing agent. Contemporaneous purchase documentation and accompanying testing and inspection certificates consistently describe the input as "graphitized" or otherwise reference "graphitization," while the record contains no evidence suggesting that the input was a graphite preparation or mixture. While Webb Wheel identifies record evidence that could support an alternative selection, Commerce was not required to disprove every possible characterization of the input.

Commerce's selection of the *Doing Business – Turkey 2020* report as the best available information on the record for valuing inland freight and B&H expenses was also supported by substantial evidence. As Commerce explained, the report's public availability, use of actual commercial shipment costs, product specificity, and consistency with Commerce's preference for valuing all FOPs from a single surrogate country outweighed its shortcomings and rendered it superior to the competing data sources. ConMet cannot establish that Commerce's selection of the *Doing Business – Turkey 2020* report was so unreasonable that the Court should displace Commerce's judgment.

Next, Commerce reasonably determined that adjusting the USD-denominated *Doing Business – Turkey 2020* surrogate values with the Turkish PPI appropriately reflected inflation in

the surrogate country's economy and was consistent with its longstanding practice. Neither the statute nor Commerce's regulations required the additional currency conversions proposed by ConMet, and, as Commerce explained, such conversions would unnecessarily manipulate the data without improving its reliability.

Finally, Commerce's decision to treat ConMet's separately reported scrap fields as offsets to normal, rather than offsets to direct material FOPs, is supported by substantial evidence. Because the surrogate financial statements did not separately identify the treatment of scrap, Commerce selected a methodology that avoided potential distortions or double counting in the application of surrogate financial ratios. Commerce's determination was a lawful exercise of its discretion to construct normal value using the best available information.

## ARGUMENT

### I. Standard of Review

In reviewing a challenge to a final determination by Commerce, this Court holds Commerce's determination lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *see also Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing two inconsistent conclusions from evidence upon the record does not render Commerce's findings unsupported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *SeAH Steel VINA Corporation v. United States*, 950 F.3d 833, 842-43 (Fed. Cir. 2020).

Moreover, "the court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 30 C.I.T. 616, 618, 431 F. Supp. 2d 1232, 1326 (2006) (citation and quotation marks omitted) (emphasis in original omitted); *see also Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that it is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record"). Hence, a party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotation marks omitted) (citation omitted)..

In selecting the best available surrogate values, Commerce has "broad discretion to determine the 'best available information' in a reasonable manner in a case-by-case basis." *Goldlink,* 30 C.I.T. at 619 (quoting *Timken Co. v. United States,* 166 F. Supp. 2d 608, 616 (Ct. Int'l Trade 2001)). When reviewing Commerce's selection of the best available surrogate values under the substantial evidence standard, "{t}he Court's role is not to make that determination anew, but rather to decide 'whether a reasonable mind could conclude that Commerce chose the best available information.'" *China First Pencil Co. v. United States,* 721 F. Supp. 2d 1369, 1375 (Ct. Int'l Trade 2010) (quoting *QVD Food Co. v. United States,* 721 F. Supp. 2d 1311, 1315 (2010), *aff'd,* 658 F.3d 1318 (Fed. Cir. 2011)).

## II. Legal Framework for Surrogate Value Selection

In determining the "best available information," Commerce considers the following five factors: (1) broad market averages; (2) public availability; (3) product specificity; (4) tax and

duty exclusivity; and (5) contemporaneity of the data. *See* IDM at 12; *see also Clearon Corp. v. United States*, 2013 WL 646390 at *3 (Ct. Int'l Trade Feb. 20, 2013) (sustaining Commerce's practice to choose surrogate values that "represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are contemporaneous with the POR, and publicly available non-aberrational data.") (citation omitted) (internal quotation marks omitted). There is no hierarchy among these five criteria and the weight afforded each factor varies depending on the details of each case. *See Fine Furniture (Shanghai) Limited v. United States*, 353 F. Supp. 3d 1323, 1336 (Ct. Int'l Trade 2018). Furthermore, Commerce's regulatory preference is to "value all factors in a single surrogate country." 19 C.F.R. § 351.408(c)(2); *see Jiaxing Bro. Fastener Co. v. United* States, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) (sustaining Commerce's "preference to value all inputs from a single surrogate country," despite some weaknesses in the data).

## III. Commerce's Determination to Use Turkish Tariff Schedule Subheading 3801.10 ("Artificial Graphite") to Determine the Surrogate Value of ConMet's Recarburizing Agent Was Lawful and Supported by Substantial Evidence

Commerce's selection of Turkish Tariff Schedule Subheading 3801.10 ("Artificial Graphite") to value ConMet's recarburizing agent should be sustained. Webb Wheel asserts that the broader HTS subheading 3801.90 should be used to value ConMet's recarburizing agent because the product allegedly contained carbons in graphitic compounds and semi-finished graphite. Webb Wheel Br. at 11. But Commerce's determination to value ConMet's recarburizing agent using the pure artificial graphite HTS subheading, 3801.10, is supported by substantial evidence and did not rest on a "logical fallacy," as Webb Wheel alleges.

Commerce began its analysis with the understanding that artificial graphite, unlike natural graphite, is graphitized—that is, material that is *converted* into graphite. IDM at 22.

Webb Wheel does not dispute this proposition. ConMet's contemporaneous purchase, testing, and inspection records consistently described the consumed recarburizing agent as graphitized. Moreover, ConMet itself acknowledged that artificial graphite was a reasonable valuation choice, and the record contains no evidence demonstrating that the consumed input was instead a different preparation or mixture.

Webb Wheel claims that, in determining that ConMet consumed artificial graphite, Commerce ignored record evidence. Webb Wheel cites ConMet's surrogate value comments, in which ConMet initially advocated for the selection of Turkish tariff schedule subheading 2713.12 ("Petroleum Coke, Calcined"). Webb Wheel Br. at 9 (citing ConMet Final SV Comments at 3-4 (P.R. 316)). But, while ConMet initially advocated for a different HS subheading, it also stated that subheading 3801.10 was a reasonable choice for valuing its recarburizing agent input. ConMet Final SV Comments at 3-4. ConMet reiterated this point in its ministerial error allegation. ConMet Ministerial Error Comments at 6 (P.R. 373). Therefore, the record does not support Webb Wheel's contention that "ConMet. . . told Commerce it believes Turkish tariff schedule subheading 3801.10 was not appropriate." Webb Wheel Br. at 9. Parties frequently propose alternative surrogate values based on competing arguments regarding specificity, contemporaneity, or tax and duty treatment. In any event, Commerce is not bound by the parties' surrogate value preferences, but is charged with identifying the best available information, given the record evidence concerning the actual input.

Webb Wheel also argues that Commerce relied on the lack of evidence that ConMet consumed "natural" graphite as evidence that it consumed artificial graphite, describing this as a "logic fallacy." Webb Wheel Br. at 11-12. This assertion mischaracterizes both Commerce's reasoning and the administrative record. Commerce did not base its surrogate value selection on

the mere absence of evidence regarding natural graphite consumption. Rather, it relied on record evidence demonstrating that the recarburizing agent consumed by ConMet was artificial graphite. The purchase documentation examined during verification consistently identified the material as "graphitized" or otherwise referenced "graphitization." IDM at 22 (citing ConMet Verification Report at 11) (P.R. 485, C.R. 401). Commerce specifically noted that, "with every set of purchase documents" reviewed, the accompanying testing and/or inspection certificates described the material in those terms. *Id*. For instance, the inspection report dated [redacted] and the testing report dated [redacted] both list that the [redacted] with the testing report also noting that the [redacted] ConMet Verification Exhibits Part 10 at 71, 87 (C.R. 472, C.R. 474). A different testing report dated [redacted] states that the [redacted]. *Id.* at 100 (C.R. 474).

The purchase documents' repeated use of the terms "graphitized" and "graphitization," terms which Commerce understood to mean a converted product, supports Commerce's finding that the recarburizing agent was a graphitized graphite material consistent with the HTS category for artificial graphite. *Id.* at 21. Commerce did not infer artificial graphite solely because natural graphite was not shown. Instead, it relied on positive evidence of randomly selected purchase and inspection documents describing the recarburizing agent.

Commerce also observed that the record contained no evidence that ConMet had purchased or consumed natural graphite. *Id.* at 23-24. This observation was not a substitute for affirmative evidence but instead a confirmation that the record evidence pointing to a graphitized graphite product was unrebutted. Webb Wheel identifies no purchase documentation, technical specification, test report, or questionnaire response demonstrating that the input was natural

graphite. Thus, Commerce considered the absence of contrary record evidence as corroborative of the affirmative evidence supporting artificial graphite.

To support its argument that Commerce ignored "ample evidence" that ConMet's recarburizing agent was not artificial graphite, Webb Wheel references ConMet's description of its recarburizing agent as [redacted]. ConMet Section D Response at Exh. D-6 (P.R. 226, C.R. 207). This isolated, generalized description does not compel a conclusion that the product was not artificial graphite, as it does not identify a different product, contradict the graphitization references in the purchase records, or demonstrate that the input was a mixture or preparation. Despite Webb Wheel's suggestion, Commerce was not required to treat an imprecise characterization as more probative than the specific product descriptions and testing certificates associated with the actual purchases.

Webb Wheel also argues that various descriptions appearing in purchase invoices, such as [redacted] demonstrate that the input may have been a mixture or preparation that merely contained artificial graphite. Webb Wheel Br. at 12. According to Webb Wheel, Commerce erred in concluded that the recarburizing agent was artificial graphite merely because it found no evidence that ConMet consumed natural graphite. *Id.* at 12-13.

This argument again mischaracterizes Commerce's reasoning. Commerce did not use a process of elimination to conclude that the recarburizing agent was artificial graphite. Instead, it found that record evidence describing the purchased input supported classification and valuation of the recarburizing agent as artificial graphite. IDM at 21-24. Every set of purchase documents that Commerce reviewed was accompanied by testing and/or inspection certificates describing the material as "graphitized" or otherwise referencing "graphitization." Those contemporaneous

technical documents describing the nature of the purchased material provide ample evidence to support Commerce's conclusion that ConMet consumed graphitized graphite for use as a recarburizing agent.

Webb Wheel may have identified other record evidence that supports the *possibility* that the recarburizing agent could have been a mixture or a preparation distinct from artificial graphite, but this evidence is not dispositive, nor does it show that Commerce's determination was unreasonable. Generic commercial descriptions such as [redacted] are not incompatible with Commerce's finding that the product was artificial graphite. Nor do they affirmatively establish that the input was a distinct preparation or mixture covered by a different, broader tariff provision.

Under the substantial evidence standard, Commerce does not have to disprove every possible alternative, "and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo*, 383 U.S. at 620 (citing *National Labor Relations Board v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106 (1942)). Instead, Commerce only needs to select the conclusion reasonably supported by the record evidence before it. *See Consolidated Edison Co.*, 305 U.S. at 229. That is what Commerce did here, reasonably finding that the inspection certificates, which repeatedly identified the material as "graphitized," were more probative than generalized purchase invoice descriptions, in determining the nature of the recarburizing agent.

At its core, Webb Wheel asks this Court to reweigh the evidence. Even where the record supports two competing interpretations of the evidence, the Court may not substitute its

judgment for that of Commerce. *See Goldlink*, 431 F. Supp. 2d at 1326. Under 19 U.S.C. § 1516a(b)(1)(B)(i), Commerce's determination must be sustained unless it is unsupported by substantial evidence or otherwise not in accordance with law. A reasonable mind could accept the verified purchase records, testing certificates, and repeated references to graphitization as adequate evidence that the recarburizing agent was artificial graphite. Thus, even assuming Webb Wheel could identify alternative evidence supporting a different tariff classification, the Court should not disturb Commerce's surrogate value selection. *See China First Pencil*, 721 F. Supp. 2d at 1375.

## IV. Commerce's Selection of the *Doing Business – Turkey 2020* Report to Determine the Surrogate Value for ConMet's Inland Freight and B&H Expenses Was Lawful and Supported by Substantial Evidence

### A. Commerce Reasonably Determined That the *Doing Business – Turkey 2020* Report Was the Best Available Information on the Record

Substantial evidence supports Commerce's selection of the *Doing Business – Turkey 2020* report as the best available information on the record. While the report is not perfect, Commerce reasonably found that, when considered in light of the totality of the surrogate value criteria, the report was a superior choice to the other proposed data sources. Because Commerce has broad discretion in selecting surrogate value data, the Court can only reject Commerce's choice if no reasonable mind could conclude that Commerce chose the best available information. *China First Pencil,* 721 F. Supp. 2d at 1375. ConMet cannot meet this high threshold, and it improperly treats the surrogate value criteria as rigid requirements when Commerce's practice is to balance the various considerations and select the record source that best satisfies the standard set forth in 19 U.S.C. § 1677b(c)(1).

ConMet's primary argument against the *Doing Business – Turkey 2020* report is that it does not constitute the most contemporaneous source. ConMet Br. at 11-12. Commerce

acknowledged that the Hapag-Lloyd data were more contemporaneous, but reasonably concluded that the *Doing Business – Turkey 2020* report was still the best choice in light of the flaws with the other data sources. IDM at 13-14. ConMet contends that, because Commerce did not choose the *Doing Business – Malaysia 2020* report over more contemporaneous data sources in two prior proceedings, it acted inconsistently in selecting that report here. ConMet Br. at 12-13 (citing *Xanthan Gum from the People's Republic of China*, 88 Fed. Reg. 9861 (Dep't of Commerce Feb. 15, 2023), and accompanying IDM at Cmt. 6; *Certain Activated Carbon from the People's Republic of China*, 87 Fed. Reg. 67,671 (Dep't of Commerce Nov. 9, 2022), and accompanying IDM at Cmt. 7). ConMet's argument fails.

First, as Commerce noted in its final determination, the *Doing Business – Malaysia 2020* report concerns an entirely different country than the *Doing Business – Turkey 2020* report. More importantly, ConMet ignores that an analysis of which surrogate value data constitutes the best available information is inherently case-specific, and that Commerce's data selection depends on the particular sources placed on the record of a given proceeding. The determinations in *Xanthan Gum* and *Activated Carbon* involved different records, different surrogate countries, and different factual circumstances. For instance, in *Activated Carbon*, Commerce rejected the *Doing Business—Malaysia 2020* report in part because its automotive-parts data were not sufficiently specific to the merchandise at issue; here, the fact that the *Doing Business – Turkey 2020* report concerns automotive-parts makes that report particularly appropriate for valuing brake drum freight expenses, as brake drums are also automotive parts. IDM at 14. Additionally, the Hapag-Lloyd data that ConMet favors were not even on the record of those reviews. Commerce was not required to reject the *Doing Business – Turkey 2020* report

based on its decision not to use it in other proceedings, particularly given the differing factual circumstances.

ConMet also claims that the *Doing Business – Turkey 2020* report does not represent a broad market average, as it encompasses only one route. ConMet Br. at 12. But Commerce addressed ConMet's argument, finding that while the Hapag-Lloyd data may have listed more routes, the data were not actually representative because they were not based on actual charged rates but rather mere price quotes. IDM at 13. Moreover, while the *Doing Business – Turkey 2020* report may have been based on a single route, this does not mean the route was not representative or that it examined an insufficient number of uses of that route. Commerce thus reasonably determined that the report represented the market better than the alternatives,[2] given that the other sources do not reflect actual charged rates (Hapag-Lloyd), are derived from a single firm's proprietary expenses (ConMet de Mexico), or only represent a single company (Rani Transport). IDM at 13, 16-17.

Finally, ConMet argues that the *Doing Business – Turkey 2020* report is aberrational because its rates are higher than those in the alternative data sources on the record. ConMet Br. at 21-25. But Commerce reasonably determined that the report was not aberrational. IDM at 17. Contrary to ConMet's assertion, Commerce did not simply "disregard" the alleged disparity between the *Doing Business – Turkey 2020* prices and the other data on the record. Rather, Commerce acknowledged that the prices in the selected report were higher but found that this

2 ConMet claims that Commerce has previously determined that the report was not based on a broad market average. ConMet Br. at 12 (citing *Xantham Gum* IDM). But again, the report at issue in *Xantham Gum* concerned Malaysia, not Türkiye, and the record of that proceeding contained other differences. Simply because the *Doing Business – Malaysia 2020* report did not represent the broadest market average in that review, this does not mean that the *Doing Business – Turkey 2020* report does not best represent it in this investigation.

alone did not render the data aberrational. *Id.* It also explained that the other data sources did not represent accurate points of price comparison, pointing out that the Hapag-Lloyd data were not based on actual charged prices, the ConMet de Mexico data were only based on two untranslated pages seemingly representing a single invoice, and the Rani Transport data were from two years earlier than the *Doing Business – Turkey 2020* data and did not represent a broad market average because they were from a single company. *Id.* at 17.

ConMet incorrectly assumes that any data on the record may serve as a valid benchmark for determining whether a particular surrogate value dataset is aberrational. But neither Commerce nor the Court have imposed such a rule. In fact, the Court has repeatedly recognized that there is no bright-line rule establishing that data are aberrational merely because they show markedly higher rates than other data on the record. *See, e.g., Ashley Furniture Indus., LLC v. United States,* 607 F. Supp. 3d 1210, 1240 (Ct. Int'l Trade 2022) (sustaining Commerce's explanation that "'the existence of higher prices alone' is not sufficient to support the argument that {a particular dataset} results in 'aberrational' values."); *Anshan Iron & Steel Co., Ltd. v. United States*, 27 Ct. Int'l Trade 1234, 1248 (Ct. Int'l Trade 2003) ("While Plaintiffs may have only demonstrated that there is a noticeable difference in steel scrap prices . . . they have not shown that the Indian price is aberrational in comparison to other Indian prices, or to prices from other countries of similar economic development to China).

In *Jacobi Carbons AB v. United States*, the Court rejected the argument that Commerce's surrogate value selection for transportation costs was aberrational because the prices were several times higher than in other available record sources. 992 F. Supp. 2d 1360, 1375-76 (Ct. Int'l Trade 2014), *aff'd*, 619 F. App'x 992 (Fed. Cir. 2015). The Court observed that, "while

plaintiffs' observation as to the cost ratios is, no doubt, factually correct, without more it cannot be given much weight." *Id.* at 1376.

As in *Jacobi Carbons*, ConMet has not pointed to any evidence that the *Doing Business – Turkey 2020* data are aberrational, only arguing that the "prices must not be the best available information because they are too high." *Id.* The Court should not give this argument much weight, particularly because Commerce thoroughly explained why the prices from the other sources were not reliable points of comparison based on their specific flaws.[3]

ConMet argues that "even if the Hapag-Lloyd and Rani Transport data did not satisfy everyone of Commerce's preferences for surrogate values in this specific investigation, they are still reliable data sources used in previous proceedings." ConMet Br. at 23. The plaintiffs in *Jacobi Carbons* made a similar argument, which the Court rejected, stating that "{plaintiffs} claim{ } that the Philippine data is aberrational when compared to truck freight rates used by Commerce in prior reviews. Its argument is premised on the observation that the surrogate value for truck freight selected in the Final Results is several times higher than the values applied in prior reviews when Indian data was employed. . . .Despite plaintiffs' arguments, the Philippine source appears to be the best on the record." *Jacobi Carbons*, 992 F. Supp. 2d at 1375-76. As in *Jacobi Carbons*, the Court should reject ConMet's argument.

Commerce has discretion to decide whether data are aberrational as a factual matter. *See Conn. Steel Corp. v. United States*, 462 F. Supp. 2d 1322, 1331 (Ct. Int'l Trade 2006) ("Determining whether certain data are aberrational is a factual line-drawing exercise

---

[3] ConMet contends that Commerce's selection of the *Doing Business – Turkey 2020* report was unlawful because it has a legal obligation not to select aberrational surrogate values. ConMet Br. at 25. But Commerce did not select an aberrational surrogate value and, notwithstanding ConMet's arguments to the country, articulated a rational connection between the facts found and the choice made.

particularly well-suited for the expertise of an agency . . . rather than the courts.”). Commerce acted within its discretion in finding that the sole fact that the *Doing Business – Turkey 2020* prices were higher was not enough to render the data aberrational, especially when the prices from the alternative sources were not appropriate to rely on as comparators.

At their core, ConMet’s arguments against Commerce’s selection of the *Doing Business – Turkey 2020* data amount to no more than a wish that Commerce had weighed the five surrogate value criteria differently and an invitation for the Court to reweigh the evidence. But the Court has regularly sustained Commerce’s determinations, particularly in the realm of surrogate values, so long as Commerce has sufficiently explained its reasoning and “a reasonable mind might accept the evidence as adequate to support Commerce’s conclusion while considering contradictory evidence.” *Risen Energy Co., Ltd. v. United States*, 477 F. Supp. 3d 1332, 1346-47 (Ct. Int’l Trade 2020) (citing *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)); *see also An Giang Fisheries Import & Export Joint Stock Company v. United States*, 203 F. Supp. 3d 1256, 1283 (Ct. Int’l Trade 2017) (sustaining Commerce’s surrogate value selection despite an alternative data set being more product specific); *Catfish Farmers of Am. v. United States*, No. 12-00087, 2016 WL 1268196 at *3 n.5 (Ct. Int’l Trade Mar. 30, 2016) (“{T}he weight Commerce accords to each factor is within its discretion and dependent, *ad hoc,* on the record of a given proceeding and situation.”);

As the Court of Appeals for the Federal Circuit has held, “{w}hen all the available information is flawed in some way, Commerce must make a judgment call as to what constitutes the ‘best’ information.” *Lifestyle Enterprise, Inc. v. United States*, 751 F.3d 1371, 1378 (Fed. Cir. 2014). Here, Commerce did just that, exercising its discretion to find that, while the *Doing Business – Turkey 2020* data were imperfect, they were still the best available information on the

record given the flaws with the other proposed sources. This determination was supported by substantial evidence and should be sustained.

### B. ConMet Cannot Show That the *Doing Business – Turkey 2020* Report Was So Inferior to the Other Choices That No Reasonable Mind Could Accept It

As stated above, because Commerce has broad discretion to select surrogate values, ConMet can only succeed if it shows that the *Doing Business – Turkey 2020* was *so* inferior compared to the other record sources that a reasonable mind could not have found that it was the best available information on the record. But Commerce reasonably found that the other proposed datasets contained flaws that rendered them less appropriate to value inland freight and B&H expenses; ConMet cannot demonstrate otherwise.

#### 1. The Hapag-Lloyd Data

Commerce's determination that the Hapag-Lloyd data did not constitute the best available information on the record was supported by substantial evidence. While the Hapag-Lloyd data may be more contemporaneous and cover more routes, Commerce reasonably found that their flaws outweighed their strengths and that the *Doing Business – Turkey 2020* report was superior. ConMet attempts to prove otherwise, but its efforts fail.

First, ConMet complains that Commerce improperly considered the fact that ConMet used both trucks and rail as transportation—the latter of which ConMet had failed to report[4]—in determining that the Hapag-Lloyd data were not more specific based on them only representing truck freight. IDM at 13. ConMet claims that specificity relating to mode of transportation is not one of the surrogate value criteria and that the *Doing Business – Turkey 2020* data are

[4] Commerce applied partial facts available with an adverse inference to ConMet for its failure to report its rail transportation usage, and ConMet has not contested this finding before the Court. IDM at Cmt. 13.

likewise not specific to truck and rail freight. ConMet Br. at 14–15. As an initial matter, it was *ConMet* that had argued in the first instance that the Hapag-Lloyd data were more specific because they relied on truck freight; Commerce simply found the argument unpersuasive based on record evidence that ConMet also used rail transportation. IDM at 13.

Moreover, Conmet's argument ignores Commerce's statutory objective to value a respondent's FOPs as accurately as possible. *See* 19 U.S.C. § 1677b(c)(1); *Goldlink*, 431 F. Supp. 2d at 1339. Because ConMet had used both truck and rail transportation during the period of investigation, Commerce reasonably concluded it should not favor the Hapag-Lloyd data, which only capture trucking, because a truck-only price schedule would not be more accurate. IDM at 13. Commerce was not required to disregard this record evidence, particularly given that mode of transportation is a component of specificity and costs vary depending on whether freight is transported by truck, rail, or another form of transportation. Commerce reasonably considered whether the Hapag-Lloyd data's truck-specific methodology accurately reflected transportation costs when assessing the relative specificity and accuracy of the competing data.

ConMet's claim that the *Doing Business – Turkey 2020* data were "also not specific to truck and rail freight" but that Commerce did not find it a disqualifying factor mischaracterizes Commerce's analysis. ConMet Br. at 14. Commerce did not find that the report affirmatively represented both truck and rail transportation or that specificity to truck freight was a disqualifying factor. Rather, it found that the Hapag-Lloyd dataset only representing truck freight was not a positive mark in its column because ConMet did not use only trucks, it also used rail transportation. IDM at 13. In any event, this issue was only one consideration among many in Commerce's decision.

Second, ConMet contends that Commerce erroneously found that the *Doing Business – Turkey 2020* report better reflected a broad market average than the Hapag-Lloyd data because the *Doing Business – Turkey 2020* data were based on actual commercial shipping costs while the Hapag-Lloyd data consisted of price quotations rather than actual transaction prices. IDM at 13–14. Commerce's practice is to prefer transaction-based data over price quotes when both are available because Commerce does not know the conditions under which the price quotes were solicited, quotes do not necessarily represent actual, final prices, and Commerce cannot discern whether the quotes were self-selected from a broader range. *Id.* at 13; *see also Vinh Quang Fisheries Corp. v. United States*, 637 F. Supp. 2d 1352, 1358 (Ct. Int'l Trade 2009) ("When there are no better alternatives . . . Commerce may use price quotes"); *Catfish Farmers of America v. United States*, No. 12-00087, 2014 WL 7181359, at *8 (Ct. Int'l Trade Dec. 18, 2014) ("Commerce declines to use price quotes when other 'more reliable' data are on the record"); *Steel Wire Garment Hangers from the People's Republic of China*, 80 Fed. Reg 69,942 (Dep't of Commerce Nov. 12, 2015), and accompanying IDM at Cmt. 5. ConMet relies on certain proceedings where Commerce relied on price quotes, but surrogate value selection is necessarily case-specific and ConMet does not establish that the factual circumstances and party arguments in the other proceedings were identical to the current situation such that Commerce was required to rely on price quotes here. Commerce reasonably found that transaction-based data from the selected data were superior to price quotes.

ConMet also claims that the Hapag-Lloyd data "are not simply price quotations that Hapag-Lloyd offered to a single customer for an individual transaction." ConMet Br. at 15. But whether the price quotes were to a single customer or many does not change that they are still price quotes and not actual charged prices. ConMet points to no actual evidence that the price

quotes in the data are the same as actual prices paid. Additionally, as Commerce observed, the quotes may not include all relevant charges and may be self-selected from a broader range of quotes. IDM at 17. Accordingly, Commerce reasonably found that the Hapag-Lloyd dataset did not represent a better broad market average than the *Doing Business – Turkey 2020* report and was not an appropriate price comparator in determining whether the latter was aberrational.

Third, ConMet takes issue with Commerce finding the Hapag-Lloyd data less specific to the subject merchandise. ConMet Br. at 15-16. But, unlike the Hapag-Lloyd data, the *Doing Business – Turkey 2020* data were specific to "{p}arts and accessories of motor vehicles" classified under HTS 8708. IDM at 14 n. 60; ConMet SV Comments at Att. 10-11. ConMet attempts to minimize the significance of *Doing Business – Turkey 2020*'s focus on automotive parts, arguing that HTS heading 8708 encompasses a range of products. ConMet Br. at 15-16. But the question is not whether the surrogate value is identical to brake drums, but whether it is more closely related than a competing source. The *Doing Business – Turke*y *2020* report measures transportation costs for automotive parts classified under the same tariff heading as brake drums, whereas the Hapag-Lloyd schedules apply more broadly to freight. IDM at 14 ("{Commerce} find{s} that the *Doing Business Turkey* 2020, which is specific to automotive parts, is superior to price quotes from Hapag-Lloyd"). Commerce thus concluded that costs derived from shipments of comparable automotive merchandise were more specific than generalized freight rates applicable to all cargo.

In sum, ConMet cannot demonstrate that Commerce acted unreasonably in finding, after assessing the relative strengths and weaknesses of the *Doing Business – Turkey 2020* report and the Hapag-Lloyd data, that the *Doing Business – Turkey 2020* report was the better source of surrogate value information.

**2. The Conmet de Mexico Data**

Substantial evidence also supports Commerce's determination that the Conmet de Mexico data did not constitute the best available information on the record. Commerce declined to rely on this dataset—which consists of a single freight expense billed to ConMet's Mexican affiliated—for multiple reasons: 1) it reflected only one freight invoice for one company and so did not represent a broad market average; 2) it would require Commerce to use a second surrogate country when Commerce has a practice of relying on surrogate values from a single primary surrogate country when possible; 3) it constituted business proprietary information, contrary to Commerce's preference for using publicly available information; 4) it was untranslated such that Commerce could not accurately analyze it. IDM at 15-16. ConMet fails to undermine Commerce's determination.

First, Commerce found that, because the data consisted of only two pages of information concerning one invoice for a single freight expense billed to ConMet de Mexico, they did not represent a broad market average. Surrogate values are intended to approximate market-wide prices in the surrogate economy, not the individual commercial experience of one company. *See Peer Bearing Co. v. United States*, 182 F. Supp. 2d 1285, 1307 (Ct. Int'l Trade 2001) ("Commerce . . . does not focus upon a particular surrogate producer of subject merchandise if more objective, industry-wide values . . .are available because: (a) the surrogate producer is not the subject of the valuation; (b) Commerce's goal is to use surrogate values that represent the industry norm of the surrogate country, not company-specific surrogate values; and (c) Commerce prefers to value factors using public information that is most closely concurrent to the specific period of review"); *see also Zhejiang Native Produce & Animal By-Products Import & Export Corp. v. U.S.*, 2004 WL 1918933 at *5 (Ct. Int'l Trade Aug. 26, 2004) (upholding

Commerce's decision to reject a surrogate value source in part because the value was that experienced by a single producer, and not an industry-wide value). As such, it is difficult to see how Commerce could have acted unreasonably in finding that the *Doing Business – Turkey 2020* data reflected a broader market average that the Conmet de Mexico invoice.

Nonetheless, ConMet contends that the fact that the expense was incurred by its affiliate meant it more accurately reflected ConMet's cost of production and movement expenses. ConMet Br. at 18. But ConMet misunderstands Commerce's objective in selecting surrogate values. Pursuant to statute, Commerce values FOPs based on market information from a comparable surrogate economy, rather than attempting to replicate the particular commercial experience of a respondent. *See* 19 U.S.C. 1677b(c)(1); *Peer Bearing Co. v. United States*, 182 F. Supp. 2d at 1307 ("Commerce's goal is to use surrogate values that represent the industry norm of the surrogate country, not company-specific surrogate values"). Therefore, Commerce reasonably concluded that a company-specific freight expense was not preferable to market-based surrogate value data. In any event, ConMet cannot demonstrate that ConMet de Mexico being an affiliate means that its data are any more representative than data from unaffiliated companies. The fact that these data are cabined to not only the experience of a single company, but also a single freight expense within that company, clearly supports Commerce's determination that they do not represent a broad market average.

Second, Commerce properly prioritized its longstanding regulatory preference to value all FOPs using data from a single primary surrogate country—here, Türkiye.[5] IDM at 16 (citing 19 C.F.R. 351.408(c)(2) ("{Commerce} normally will value all factors in a single surrogate country")); *see also Jiaxing*, 11 F. Supp. 3d at 1332-33 (2014) (Commerce's policy is "to only

[5] ConMet does not contest the selection of Türkiye as the primary surrogate country.

resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable.") (cleaned up). ConMet contends that, because the *Doing Business – Turkey 2020* report is unreliable, Commerce should resort to choosing Mexico as a secondary surrogate country. ConMet Br. at 17-18. But, as explained above, Commerce reasonably found that the report was the best available information on the record despite certain shortcomings and that the ConMet de Mexico data failed to satisfy multiple criteria.

The plaintiffs in *Jiaxing* propounded a similar argument, alleging that data from a secondary surrogate country (the Philippines) were superior to data from the primary surrogate country (Thailand). 11 F. Supp. 3d at 1333. Despite finding that the plaintiffs had raised reasonable points regarding the superiority of the Philippine data, this Court upheld Commerce's determination to rely on the Thai data because "{a} reasonable mind could {} conclude that Commerce's regulatory preference to value all inputs from a single surrogate country favors using Thai data to value all of Plaintiffs' inputs despite some apparent relative superiority of the Philippine financial and {FOP} data." *Id*. Thus, even if the Court regards the ConMet de Mexico data as superior in certain respects, this would not obviate Commerce's regulatory preference to rely on a single surrogate country or otherwise render Commerce's determination unsupported by substantial evidence. Commerce reasonably concluded that suitable surrogate value data existed from the primary surrogate country and, consistent with 19 C.F.R. § 351.408(c)(2), appropriately declined to resort to a secondary surrogate country. Because ConMet's argument rests entirely on its disagreement with Commerce's evaluation of the *Doing Business – Turkey 2020* report, the Court should pay it no further heed.

Third, Commerce properly found that the ConMet de Mexico dataset failed to satisfy another criterion because it was not publicly available. IDM at 16. Commerce's regulation

expressly provides that Commerce "normally will use publicly available information to value factors," reflecting Commerce's longstanding preference for transparent, verifiable information when selecting surrogate values. 19 C.F.R. § 351.408(c)(1). Commerce has long considered public availability an important surrogate value criterion because publicly available data permit Commerce and interested parties to evaluate the underlying methodology, assumptions, and reliability of the data, whereas proprietary company-specific information cannot be fully scrutinized or replicated. *See e.g.*, *Certain Frozen and Canned Warmwater Shrimp from the Socialist Republic of Vietnam*, 69 Fed. Reg. 71,005 (Dep't of Commerce Dec. 8, 2004), and accompanying IDM at Cmt. 1 (recognizing Commerce's "longstanding practice and stated preference for publicly available information").

ConMet contends that Commerce unfairly applied this standard to its affiliate's data because Commerce did not review the proprietary underlying data in the *Doing Business – Turkey 2020* report either. ConMet Br. at 19. But ConMet overlooks that the *Doing Business – Turkey 2020* report is itself a publicly available publication whose methodology and survey results have been released by the World Bank for public use. ConMet SV Comments at Att. 10. Commerce thus relied on a detailed World Bank industry survey in the primary surrogate country, for which the record contains both the report's methodology and the specific assumptions underlying its reported freight expenses. In contrast, the only support for the proposed Mexican surrogate value was a single business proprietary invoice from one company that could not be fully evaluated because it was confidential and untranslated.[6] *See* ConMet Conmet Supp. Section A/C Response at Exh. SC-33. ConMet also points out that it publicly

[6] ConMet acknowledges that Commerce found its affiliate's data flawed because it was untranslated and so could not be properly analyzed, but does not contest this finding. ConMet Br. at 19. Of course, it should not be allowed to do so for the first time on reply.

disclosed the inland freight expense in its administrative case brief, ConMet Br. at 19, but Commerce found that, while "ConMet provides a table calculating a proposed inland freight {surrogate value}" and cites the data, the underlying data are not publicly available. IDM at 16.

Commerce cited multiple reasons for declining to rely on the ConMet de Mexico data and ConMet cannot establish that any reasonable person would have necessarily found that the Mexican data's perceived strengths outweighed their weaknesses. The Court should not disturb Commerce's determination not to use the ConMet de Mexico data.

### 3. The Rani Transport and *Doing Business – Malaysia 2020* Data

ConMet argues that, if the Court holds that Commerce reasonably declined to rely on the Hapag-Lloyd and ConMet de Mexico datasets, the Rani Transport dataset is still a superior choice to the *Doing Business – Turkey 2020* report. While ConMet claims that Commerce did not explain the flaws with the Rani Transport data, this statement is simply not accurate. First, ConMet never actually argued in its case briefs that Commerce should select the Rani Transport data; as such, it is hardly surprising that Commerce addressed that dataset less comprehensively than the others, and ConMet cannot establish that Commerce was required to provide a detailed discussion of that data when no party advocated for their selection. *See Pirelli Tyre Co., Ltd. v. United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025) ("The substantial-evidence standard requires Commerce to consider all evidence on the record, but such consideration does not necessitate explicit mention and discussion of each piece of evidence."); *see also Husteel Co., Ltd. v. United States*, 98 F. Supp. 3d 1315, 1359 (Ct. Int'l Trade 2015) (Commerce need not "specifically address" arguments that are not significant).

In any event, Commerce *did* explicitly address the Rani Transport data, explaining that they did not represent a broad market average because they are derived from a single company

and that they were not contemporaneous, as the data are from two years earlier than the *Doing Business – Turkey 2020* report and five years earlier than the period of investigation. IDM at 17. Moreover, the Rani Transport data are from Malaysia and selecting them would have required Commerce to disregard its preference for relying on surrogate value data from a single primary surrogate country. Commerce's reasoning for not using the ConMet de Mexico data because they were from a second country applies equally to the Rani Transport data.

Finally, ConMet lodges the bizarre argument that, even though it does not argue that Commerce should have selected the *Doing Business – Malaysia 2020* report, Commerce still erred by not addressing that report in its final determination. ConMet Br. at 21. But ConMet cites no authority for the proposition that Commerce is required to discuss in explicit detail every single proposed surrogate value data source even when no party has advocated for its selection. Again, Commerce is not required to discuss every piece of evidence on the record, particularly when no party mentioned it in their case briefs. *See Pirelli*, 128 F.4th at 1271.

In any event, Commerce's rationale for not selecting that source is readily apparent. Like with the Rani Transport data, the *Doing Business – Malaysia 2020* report would require Commerce to use a second surrogate country, contrary to its longstanding preference. Assuming that the *Malaysia 2020* and *Turkey 2020* reports were otherwise commensurate, that factor alone would have been sufficient for Commerce to choose the *Turkey 2020* report over the *Malaysia 2020* one. Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). Here, Commerce's path is readily discernible, and the Court should not remand simply for Commerce to further explain why it did not choose a data source that no party believes should have been selected.

### C. Commerce Did Not Err in Its Calculation of the Surrogate Value for Inland Freight and B&H Expenses

ConMet asserts that Commerce's surrogate value calculation was not supported by substantial evidence and not in accordance with law because it did not adjust for inflation in the manner proposed by ConMet. This argument is without merit, as Commerce explained why it should not diverge from its standard practice and unnecessarily manipulate the data.

#### 1. Commerce's Application of an Inflator Was Consistent with its Normal Practice and Adequately Explained

When Commerce selects a surrogate value from a non-contemporaneous period, Commerce's practice is to account for inflation or deflation by applying an inflator based on PPI or wholesale price index of the surrogate country. IDM at 18; *see also, e.g.*, *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 79 Fed. Reg. 65,377 (Dep't of Commerce Nov. 4, 2014) (*Frozen Shrimp from Vietnam 2012-2013*), and accompanying IDM at Cmt. 4; *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam*, 81 Fed. Reg. 62,717 (Dep't of Commerce Sep. 12, 2016) (*Frozen Shrimp from Vietnam 2014-2015*), and accompanying IDM at Cmt. 3; *Non-Frozen Apple Juice Concentrate from the People's Republic of China*, 69 Fed. Reg. 65,148 (Dep't of Commerce Nov. 3, 2004), and accompanying IDM at Cmt. 3; *Fresh Garlic from the People's Republic of China*, 75 Fed. Reg. 61,130 (Dep't of Commerce Oct. 4, 2010), and accompanying IDM at Issue 3.[7] Commerce calculates the inflator using indices "based on the country in which the expenses were incurred, not the currency in which it was reported." *Frozen Shrimp from Vietnam 2012-2013* IDM at 40. To apply an

[7] ConMet attempts to cast doubt on the existence of a practice by saying that Commerce did not cite a sufficient number of other proceedings in its final determination, but notably does not offer its own examples of Commerce diverging from the inflation adjustment method used here, or the rationale behind such divergence.

inflator based on the U.S. PPI would fail to accurately represent the economic activity of the country in which the surrogate value was sourced. *See id.* at 39. The application of an inflator falls within Commerce's discretion to calculate surrogate values based on the best available information.

Commerce also has well-established practice of applying an inflator derived from the surrogate country's economic data, including when the data are represented in USD. *See, e.g.*, *Frozen Shrimp from Vietnam 2012-2013* IDM at Cmt. 4 (applying an inflator based on the Bangladeshi Consumer Price Index (CPI) directly to USD-denominated data to calculate various surrogate FOPs), *Frozen Shrimp from Vietnam 2014-2015* IDM at Cmt. 3 (same); *Certain Steel Racks and Parts Thereof from the People's Republic of China*, 89 Fed. Reg. 25,235 (Dep't of Commerce Apr. 10, 2024), and accompanying IDM at Cmt. 1 (applying an inflator based on the Bulgarian PPI directly to USD-denominated data to calculate the inland freight surrogate value).[8] As Commerce has explained, directly applying the reporting country's inflator, based on that country's economic data, to USD-denominated values avoids unnecessary manipulations from currency conversion. IDM at 19; *see also Frozen Shrimp from Vietnam 2014-2015* IDM at Cmt. 3 (explaining that the extra conversion of currencies in an inflator calculation was unnecessary and manipulative of the import statistics).

Here, in calculating the surrogate value for inland freight and B&H, Commerce relied on USD-denominated data from the *Doing Business – Turkey 2020* report. IDM at 12. Commerce then calculated a Turkish lira-based inflator by comparing the average domestic Türkiye PPI for

[8] Commerce continued to apply this same inflator practice from the *Doing Business – Turkey 2020* data in *Steel Racks from China*. Although the *Steel Racks from China* postdates the underlying determination, it still demonstrates the continuity in Commerce's inflator practice as applied to the same inland freight dataset.

2019 and the corresponding average PPI during the period of investigation. *See* Final Surrogate Values at Att. 6a, 8 (P.R. 434). Using this inflator, Commerce adjusted the USD values to account for inflation in the surrogate country between the non-contemporaneous data and the period of investigation. IDM at 18. Because these values were originally denominated in USD in the *Doing Business – Turkey 2020* report, Commerce applied the inflator directly to the USD values to determine the inland freight surrogate value. IDM at 18. Commerce's methodology is straightforward—because the surrogate data reflect costs incurred in Türkiye, Commerce adjusted those costs using an inflation index that measures price changes in Türkiye. This approach directly reflects changes in the surrogate country's economy during the relevant period and is consistent with Commerce's longstanding practice.

ConMet relies on this Court's decision in *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016), to argue that Commerce's practice is not sufficient to show why the methodology is lawful. ConMet Br. at 28. But Commerce did not solely rely on prior practice as an independent justification. It also provided a comprehensive explanation of why that practice remains appropriate—inflation should reflect changes in the surrogate country's economy and introducing additional exchange-rate conversions unnecessarily manipulates published data. IDM at 18-19.

ConMet also argues that Commerce's inflation adjustment calculations lead to inaccurate results and suggests an alternative formula that allegedly yields a more accurate surrogate value. ConMet Br. at 25-27. ConMet's argument rests on the assumption that Commerce should reconstruct the original Turkish-lira values in the *Doing Business – Turkey 2020* publication by reversing the World Bank's currency conversion, applying Turkish inflation, and then converting the values back into USD using a different exchange rate. But ConMet's proposed formula does

not demonstrably result in a more accurate surrogate value and runs contrary to Commerce's normal practice of not unnecessarily manipulating data. Converting the published USD values into Turkish lira, inflating those constructed values, then converting them once again into USD would introduce unnecessary manipulation into a published and otherwise reliable data source that is on the record.

ConMet's claim that Commerce's method of inflation adjustment is "seriously flawed" is unsupported by the record. ConMet Br. at 29. ConMet relies on what it claims are two more accurate inland freight values on the record in alleging that Commerce's calculated surrogate value is improper: 1) "quotes for inland freight from Turkey" placed on the record as potential surrogate values, and 2) the inland freight surrogate value derived from ConMet's proffered inflator formula. *Id*. at 27-29. According to ConMet, the disparity between Commerce's calculated surrogate value and the two comparators demonstrates that the calculated surrogate value is inaccurate. *Id.* But the record does not support the averred accuracy of these comparators. Regarding the first, Commerce explained that price quotes "do not necessarily include all relevant charges and do not reflect actual commercial transactions." IDM at 13; *see also Steel Wire Garment Hangers* IDM at Cmt. 5. Price quotes do not contain the full picture of a commercial transaction, so a comparison of those quotes to Commerce's calculated surrogate value has little persuasive value. As to the second, the surrogate value derived from ConMet's suggested formula shows only that ConMet's formula results in a different number than Commerce's standard formula.

At bottom, ConMet's argument consists of little more than saying that an alternative methodology might have produced a different result, which is insufficient to undermine Commerce's determination. Commerce is not required to demonstrate that its methodology is

the only reasonable approach or the most economically sophisticated approach. Rather, it need only demonstrate that its chosen methodology is reasonable and supported by the record. *See Consolidated Edison Co.*, 305 U.S. at 229. And ConMet's assertion that Commerce's calculated surrogate value results in a higher number than its own calculation does not establish that Commerce's methodology is unreasonable.

ConMet's suggested inflator formula would require Commerce to convert the *Doing Business – Turkey 2020* data to Turkish lira, apply the inflator, and then re-convert back to USD. ConMet Br. at 27. Commerce has found that adding two layers of currency conversions unnecessarily manipulates the data and may lead to "data distortions." *Frozen Shrimp from Vietnam 2014-2015* IDM at Cmt. 3 ("To convert the currency, twice more, would introduce unnecessary manipulation of the import statistics."); *see also* IDM at 19. Commerce reasonably determined that including multiple additional conversion steps would reduce, not improve, the reliability of published and otherwise reliable data. As such, comparisons between ConMet's alternative surrogate value calculation and Commerce's calculated surrogate value have no persuasive value. ConMet has failed to show how adding two layers of currency conversions would *not* distort the surrogate value number. Commerce reasonably determined that applying its established inflator practice was the least distortive.

Commerce's approach is also consistent with Commerce's longstanding preference to value all factors of production using data from a single surrogate country. 19 C.F.R. § 351.408(c)(2); *see also Tri Union Frozen Products, Inc. v. United States*, 227 F. Supp. 3d 1387, 1400 (Ct. Int'l Trade 2017) ("Understandably, {Commerce} prefers to use surrogate value data from the primary surrogate country to minimize distortion."). The rationale underlying that preference is that surrogate values from the same country reflect a common economic

environment, minimizing distortions that may arise from combining data generated under different market conditions. That rationale applies with equal force here. Inflation is itself an economic characteristic of the surrogate country. Applying the Turkish PPI to Turkish surrogate values promotes a consistent valuation methodology where both the surrogate values themselves and any adjustments to them reflect a single economic framework.

In sum, Commerce reasonably exercised its broad statutory discretion by inflating the *Doing Business – Turkey 2020* SVs using the Turkish PPI, consistent with its established practice. Even if the Court finds *some* merit to ConMet's proposed inflation adjustment, this would not be sufficient to demonstrate that Commerce's inflation adjustment methodology was not supported by sufficient evidence and explanation that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229 (1938). As this Court has acknowledged, "{t}he data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect." *Heze Huayi Chemical Co., Ltd. v. United States*, 2018 WL 2328183 at *6 (Ct. Int'l Trade May 22, 2018). And when "Commerce is faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information." *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1277 (Ct. Int'l Trade 2006); *see also Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1313 (Ct. Int'l Trade 2007) ("Where Commerce is confronted with two alternatives {both of which have their good and bad qualities}, and Commerce has a preferred alternative, the court will not second-guess Commerce's choice."). Here, Commerce reasonably chose to adhere to its practice and explained why it did so; the Court should not disturb this determination.

### 2. Commerce's Surrogate Value Calculation Was Consistent with its Statutory and Regulatory Obligations

ConMet argues that Commerce's surrogate value calculation contravenes 19 U.S.C. § 1677b(c) and 19 C.F.R. § 351.408(c). However, it fails to show any specific statutory or regulatory language undermining Commerce's determination. Instead, ConMet simply assumes that Commerce's inflator practice runs contrary to a general obligation to accurately calculate factors of production. But section 1677b(c) provides only that surrogate values must be based on the best available information. As previously stated, Commerce has "broad discretion" in selecting the best available information to calculate FOPs and movement expenses. *Goldlink,* 431 F. Supp. 2d at 1327. Commerce acted within this discretion and ConMet cannot show that, by doing so, Commerce somehow violated statutory or regulatory requirements.

Nor can ConMet show that Commerce abused its discretion. The Federal Circuit has held that "{a}n abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgement in weighing relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005) (citing *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed Cir. 2004)). As explained above, Commerce weighed the proposed surrogate value calculation methodologies and reasonably determined that adhering to its practice and applying the Turkish inflator to the USD-denominated the *Doing Business – Turkey 2020* data would reflect the economic conditions in the surrogate country and avoid any potentially distortive manipulation of the data. If Commerce had *diverged* from its practice by using ConMet's suggested inflator formula, then an argument might be made that it acted arbitrarily or abused its discretion. But that is not the case here, and ConMet fails to undermine Commerce's calculation of the surrogate values for inland freight and B&H expenses.

## V. Commerce's Determination to Treat Certain Scrap Fields as Offsets to Normal Value Was Lawful and Supported by Substantial Evidence

Commerce's determination to apply ConMet's reintroduced cast iron scrap offset to NV after the application of surrogate financial ratios was supported by substantial evidence, consistent with its established methodology, and accounts for the relationship between ConMet's reported FOPs and the surrogate financial ratios. Commerce reasonably exercised its discretion to construct normal value using the best available information while avoiding potential distortions in the calculation.

ConMet argues that Commerce has deviated from its standard methodology, identifying past instances where Commerce treated scrap metals as direct materials. ConMet Br. at 33-34 (citing *Cast Iron Soil Pipe Fittings from the People's Republic of China*, 83 Fed. Reg. 33,205 (Dep't of Commerce July 17, 2018), and accompanying IDM at Cmt. 5; *Small Diameter Graphite Electrodes from the People's Republic of China*, 81 Fed. Reg. 62,474 (Dep't of Commerce Sep. 9, 2016), and accompanying IDM at Cmt. 6). In doing so, ConMet focuses on the physical outcome of the scrap cast iron (*i.e.*, whether it was sold or reintroduced into production), rather than the accounting implications of valuing the merchandise using surrogate financial statements. This granular focus loses sight of Commerce's overarching statutory objective: constructing normal value using surrogate financial data that accurately reflect production costs per 19 U.S.C. 1677b(c)(3) and (4).

With this objective in mind, Commerce reasonably exercised its discretion in determining the methodology that best matches ConMet's reported FOPs with the accounting data from the surrogate producer's financial statements. Unlike ConMet's records, the surrogate financial statements do not separately identify the value of reintroduced scrap or otherwise demonstrate that such amounts have been excluded from the cost of goods sold. *See* ConMet SV Comments

at Att. 10 (P.R. 274); *see also* IDM at 62. Because the surrogate financial statements combined its production costs, Commerce could not attribute value to recycled materials. If Commerce were to reduce ConMet's direct material costs before applying the surrogate financial ratios (*i.e.*, treat cast iron scrap as direct materials), it would apply overhead, SG&A, and profit to a smaller cost base than that reflected in the surrogate producer's financial statements, creating an inconsistency in the calculated ratios.

Commerce avoided this inconsistency by first applying the surrogate financial ratios to ConMet's full manufacturing costs and then deducting the scrap credit from normal value. This methodology ensures that the credit exhibits a proportionate share of the overhead, SG&A, and profit identified in the surrogate company's financial statements. This reasonable approach prevents devaluing normal value in a situation where Commerce lacks record evidence demonstrating that the surrogate company's financial statements removed recycled scrap from its COGS.

*Cast Iron Soil Pipe Fittings from China* and *Small Diameter Graphite Electrodes from China* do not require a different result. In both cases, Commerce did not value reintroduced scrap as a distinct input. IDM at 63. ConMet claims that Commerce did not "explain the relevance of its distinction" and argues that "{t}he differences in reporting format" are irrelevant. ConMet Br. at 37. The distinction, however, is not a mere difference in reporting format; rather, it substantively affects how Commerce constructs normal value.

In both *Cast Iron Soil Pipe Fittings from China* and *Small Diameter Graphite Electrodes from China*, Commerce did not need to separately value reintroduced scrap because the respondents in those cases reported only net material consumption. Accordingly, Commerce concluded that the creation and reuse of scrap were already reflected in the reported FOPs, and

no separate scrap credit entered the normal value calculation. *See e.g., Small Diameter Graphite Electrodes from China* IDM at page 65 ("Forming scrap is continuously reintroduced in the production of SDGEs . . . no forming scrap is consumed and there is no need to allow for a scrap offset or to add re-introduced forming scrap to the FOP buildup.").

By contrast, here ConMet reported cast iron scrap as a distinct input, and Commerce assigned it a separate surrogate value. Once the scrap is separately valued, Commerce must determine the appropriate point in the normal value calculation to apply that offset. This reporting difference is not an "arbitrary" distinction, but resulted in the accounting issue that Commerce had to resolve between the financial statements of ConMet and the surrogate company.

*DuPont Teijin* confirms the discretion afforded by the statute to adopt a reasonable accounting methodology for by-products and recycled materials. There, the Court acknowledged Commerce's longstanding practice of avoiding double counting by granting an offset for by-products that are either sold or reintroduced into production. *DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014). Acknowledging that 19 U.S.C. § 1677b(c)(1) "does not require a particular method of accounting for by-products," the Court recognized Commerce's discretion to select a reasonable methodology. *Id.* at 1345. The Court further recognized that "Commerce's practice generally has been to grant the producer a credit or offset for by-products generated in the manufacturing process that are either sold or *reintroduced into production*, instead of valuing the recycled input at zero." *Id*. at 1346 (*emphasis added).* Here, Commerce acted within its normal practice by applying ConMet's scrap offset to normal value after the application of surrogate financial ratios, thereby avoiding the potential distortion that could result from deducting the separately valued scrap credit before the

application of those ratios when the surrogate financial statements do not separately identify scrap.

"In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). ConMet may have presented an alternative methodology for valuing the factors of production, but "Commerce need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was reasonable." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 721 (Ct. Int'l Trade 2001). In light of the "wide discretion" Commerce may exercise in the valuation of FOPs, *Ad Hoc Shrimp Trade Action Committee v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010) (citation omitted), Commerce has met its burden to show that its methodology is reasonable.

In sum, because the surrogate financial statements do not separately identify the treatment of scrap, Commerce reasonably concluded that applying the scrap offset after the surrogate financial ratios best avoids potential double-counting and maintains consistency with its methodology. Neither the statute nor Commerce's prior determinations require a different result. Commerce's determination is supported by substantial evidence and is otherwise in accordance with the law.

## CONCLUSION

For these reasons, we respectfully request that the Court deny Plaintiffs' motions, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 305-768
Email: sosun.bae@usdoj.gov

OF COUNSEL:

ELLIOTT BREWER
Attorney
Department of Commerce
Office of Chief Counsel
for Trade Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

August 14, 2026

Attorneys for Defendant

**CERTIFICATION OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chamber Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules. According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 12,559 words, excluding those exempted portions of this brief.

/s/ Sosun Bae
SOSUN BAE